# Nevling *versus* Commonwealth.

1. It is the duty of the Commonwealth in a criminal case to prove everything necessary to constitute the crime fully and clearly to the satisfaction of the jury. If the Commonwealth fails to make out any of the necessary parts of the crime, the jury must acquit; or if the evidence after it is all heard by the jury leaves the question of guilt in doubt, so that it is difficult to determine, that doubt must work the acquittal of the defendant. The doubt must, however, be a reasonable one, and jurymen cannot doubt as jurymen what they would believe as men.

2. On a trial for murder, where the defence of insanity, at the time of the commission of the crime, was set up, the court stated to the jury that the presumption was in favor of sanity and that the burden of proof was upon the defendant to overcome that presumption. He then enumerated the various grades of unsoundness of mind and the causes from which it might flow, adding as follows: "However it may have originated, when it is shown to exist to such an extent as to destroy or seriously impair one's judgment or consciousness of right or wrong, it is a defence to any criminal charge. Whenever a person has sufficient mental capacity to distinguish right from wrong, to understand and appreciate the character of what he does, and to judge of probable consequences of his acts, the law holds him criminally responsible for them, although he may in some respects be weak-minded . . . But if the unsoundness of mind goes to that extent of destroying his capacity to distinguish right from wrong, and disabling him from understanding the nature and character of his acts and their probable and ordinary consequences, the law will not hold him criminally responsible for them." *Held*, that the instruction was not erroneous.

3. Where, on a trial for murder, the contention of the defendant is that he has been guilty of murder in the second degree only, the court, having once in its charge clearly defined the grades of that offence, is not bound to repeat said instruction in charging as to other features of the case.

4. On a trial for murder the defence set up was intoxication on the part of the defendant at the time of the perpetration of the crime. The court in its charge reviewed the facts at length, stated correctly the various degrees of the offence of murder, explained to the jury with relation to the particular facts, in what condition they must find the prisoner to have been in order to reduce the grade of his offence to the second degree,

[Nevling *v.* Commonwealth.]

and concluded thus: "In this case the only question arising and the only one disputed by defendant's counsel, is whether the defendant was in such a condition as to be capable to form a design to kill, and did kill in pursuance of that design." *Held*, that this instruction was not erroneous.

5. In said case defendant requested the court to charge that if the evidence should appear to show intelligence on defendant's part, and that he was watchful and capable of determining his purpose of committing the murder and of selecting the means for its accomplishment, and that he also had ample time for reflection and seemed to act in his right mind and from a conscious purpose, still it did not necessarily follow that he was in such a state of mind as would authorize his conviction of murder in the first degree. The court answered the point by saying that it seemed more like the statement of an argument than of a legal principle. That it was no doubt true that a man might seem to be intelligent and to be perfectly conscious of what he was doing, when in reality he was not so. That appearances were often deceptive, but that if the jury found that defendant had understanding, was conscious of what he was doing, was capable of distinguishing between right and wrong, had time to meditate and did meditate upon the purpose of committing the murder, and then proceeded to perpetrate the crime, they must find him guilty of murder in the first degree. *Held*, that this instruction was not erroneous.

6. In said case defendant requested the court to charge that before defendant could be convicted of murder in the first degree the evidence must show that at the time the crime was contrived and executed, defendant possessed that self-determining power which in a sane mind renders it conscious of the real nature of its own purposes and capable of resisting wrong desires. The court affirmed the point, provided the jury were satisfied that the facts therein stated were true, adding: "The ordinary presumption of law concerning a human being is that he was a reasonable creature at the time he perpetrated the act, and that he was not ignorant of the consequences of it, but that he was conscious that he was doing wrong and knew the consequences of that act." *Held*, that the answer, though somewhat obscure, was not erroneous.

7. In said case the defendant requested the court to charge that if this self-governing power was wanting in defendant, whether it was caused by insanity, gross intoxication or other controlling influence, it could not be truthfully said that his mind was fully conscious of its own purposes, and deliberated or premeditated in the sense of the act describing murder in the first degree. The court affirmed the point, adding that, "if the impulse which impelled defendant to do the deed was an impulse actuated by a bad and depraved mind and a heart fatally bent on mischief, then it would be murder. That an impulse to kill, resulting from the wickedness and depravity of the heart, was the very essence of murder, but that if the impulse to kill resulted from unsoundness of mind the act would not be murder." *Held*, that the answer was not erroneous.

8. In said case evidence was offered by the defendant to show the uttering of threats by the murdered man against defendant two days prior to the perpetration of the crime. It was, however, neither averred nor proved that said threats had been communicated to defendant. *Held*, that said threats were not part of the *res gestæ* nor relevant to the point at issue, and that therefore the evidence was properly excluded.

9. In such case as is detailed above the opinions of persons who had frequently seen defendant intoxicated, but not on the day of the murder,

as to his mental condition when in that state, are not admissible in evidence on his behalf.

10. The requisites of a charge to the jury in a murder case, where the defences of insanity and intoxication are set up, discussed and determined.

11. Jones *v.* Commonwealth, 25 P. F. Smith, 403, explained and distinguished.

June 13th 1881. Before Mercur, Gordon, Trunkey, Sterrett and Green, JJ. Sharswood, C. J., and Paxson, J., absent.

Error to the Court of Oyer and Terminer of *Clearfield county :* Of May Term, 1881, No. 68.

Indictment of John A. Nevling for the murder of Samuel Pennington. Plea, not guilty.

On the trial, before Orvis, A. L. J., and Holt and Ogden, A. JJ., there was no dispute as to the fact of the murder, but the question was whether the prisoner was guilty of murder in the first, or in the second degree. The defence was that by reason of intoxication at the time of, and previous to the killing, the prisoner was in such a condition that he was not capable of forming a design to kill, deliberately and with premeditation. The material facts were these: The prisoner was about thirty years of age, of very intemperate habits, unmarried, and lived in a shanty about a mile from Houtzdale. When sober, he was peaceable, but the reverse when drunk. During the 16th day of February 1880, he drank a large quantity of whiskey, and became very drunk before evening. About 8 o'clock P. M. he was in a store in Houtzdale, when Samuel Pennington, a young man nineteen years of age, came in, and some quarrelsome words ensued, which resulted in a fight on the street, in front of the store, during which Pennington struck Nevling on the head with a billy, threw him to the ground and beat him severely. Upon Nevling's calling for assistance, Pennington released him, whereupon Nevling got up and said to Pennington: "Sammy, you have done that nicely; let us shake hands." Pennington shook hands with him and then left. Another witness testified that Nevling said: "You whipped me this time, will you fight me again?" Pennington said he would. Several witnesses testified that soon afterwards Nevling made threats that "he would shoot the damned son-of-a-bitch, and didn't care a God damn if he would hang on the gallows for it." He drank more whiskey that evening, and obtained a pint bottle of whiskey, which he took home with him. To one witness whom he met he showed the wound on his head, and showed the pint bottle

[Nevling v. Commonwealth.]

full of whiskey, which he said he was going to take home and drink the next morning, and then he would take his gun and go to town and shoot the damned son-of-a-bitch who hit him. He arrived home very drunk and went to bed about eleven o'clock, without taking any supper but a cup of coffee; his brother, who occupied a separate bed, testified that he was restless; "hollering and talking almost all night, altogether about his head, and sometimes groaning, and so on." He remained in bed until after eight o'clock the next morning, ate no breakfast, but, complaining of his head, drank a pint of whiskey and also a half-pint of alcohol, in which was dissolved about an ounce of gum camphor, and then started to town, taking his gun with him. On his way, he stopped at a place to get some tobacco. A witness testified: "He asked me for a smoke; I gave him a cigar; he put the gun down and said: 'I have a load in this gun to shoot the —— —— —— that hit me last night with a billy.' Says I to him: 'Don't you know you will hang if you shoot a man?' Says he, 'I don't care a God damn; I am going to shoot the man.' Upon these words he left."

He then proceeded to Houtzdale, where the streets were crowded, it being election day. He paraded, staggering, for a considerable time, and attracted much attention. He drank more whiskey in Houtzdale, from a pint bottle which he had. After travelling about for some time, he met Pennington on the street, walking alone; Pennington was sober; Nevling was very drunk, but one or more witnesses testified that he seemed to have self-control. The men passed each other, and, at the distance of about twenty-nine feet from Pennington, Nevling turned, raised the gun, and fired; the charge, consisting of several buckshot, took effect in Pennington's back, near the shoulder-blade. He reeled and fell, placing one hand, as he fell, to his hip pocket, from which a loaded revolver was protruding. Pennington lingered until April 18th 1880, when he died from the effect of his wounds.

Almost immediately after the shooting, Nevling was arrested by a citizen, George Wooden, amid great excitement. Wooden testified that Nevling said: "I done the deed and I'm willing to submit to anything, but I want you to protect me, I don't want you to let them hurt me." Wooden took him to a room in a hotel, and locked him up till a train came, which was stopped back of the house, and Nevling was put on the train through the back door by a constable, without letting the crowd in front know of it, as they were clamorous about lynching him. Another witness testified that Nevling said, while being handcuffed in the hotel room, that "he had been looking for this for some time; that he was bound to hang any way, and might as well have it first

as last," or words to that effect, but, " he didn't want to be hung right off, as he wanted two hours to prepare to meet his God."

There was evidence that several of the prisoner's maternal uncles and aunts had been more or less insane, and that some of his relations on his father's side were addicted to intemperance.

The defendant's counsel offered to prove that on February 14, two days before the murder, after Nevling, Pennington and the witness had been drinking together, Pennington made threats against Nevling, saying : " He had it in him (referring to himself), and he would give it to him some time again." Objected to as not being part of the *res gestœ*, and because it was not offered to prove that Nevling had knowledge of such threats ; objection sustained ; exception. (9th assignment of error.)

The following questions, put by defendant's counsel to witnesses, were objected to, and excluded, viz.: Q. From Nevling's manner in your office, and from what he said and did, do you think he was rational and knew what he was talking about ? (10th assignment.) Q. Does Nevling, when drunk, in your judgment, and from your knowledge of the man as you have detailed it, possess the power to control himself and resist wrong impulses ? (11th assignment.) Q. From your knowledge, derived from having seen the prisoner frequently in a state of intoxication, is he, in your opinion, a sane or insane man when in that condition ? (12th assignment.)

Defendant's counsel presented the following points :

2. " If the evidence should appear to show intelligence on the part of the defendant, and that he was watchful and capable of determining his purpose of shooting Pennington, and of selecting the means of its accomplishment, and that the defendant had ample time for reflection and seemed to act in his right mind, and from a conscious purpose ; still it does not necessarily follow that the defendant was in such a state of mind as would authorize his conviction of murder in the first degree." *Answer.* " This seems more a statement of an argument than of a legal principle. It is no doubt true that a man may seem to be intelligent and to be perfectly conscious of what he is doing, and therefore responsible for his acts, when in reality he is not so. Appearances are often deceptive. But if you find as a fact that he had understanding, that he was conscious of what he was doing, that he contemplated the consequences of his act, and was capable of distinguishing between right and wrong ; that he had time to meditate, and did meditate upon the purpose of taking Pennington's life, and then proceeded to take his life, we say to you that this would constitute murder in the first degree, and it would be your duty, if you find such a state of facts, to render such a verdict." (6th assignment.)

[Nevling *v.* Commonwealth.]

3. "Before defendant can be convicted of murder in the first degree the evidence should show that he possessed, when the shooting of Pennington by him was contrived and executed, that self-determining power which in a sane mind renders it conscious of the real nature of its own purposes and capable of resisting wrong impulses." *Answer.* "We affirm this point, gentlemen of the jury, with this qualification : that you must be satisfied from all of the evidence in the case that the facts stated in this point are true. The ordinary presumption of law concerning a human being is that he was a reasonable creature at the time he perpetrated the act, and that he was not ignorant of the consequences of it, but that he was conscious that he was doing wrong and knew the consequences of that act." (7th assignment.)

4. "If this self-governing power was wanting in defendant, whether it was caused by insanity, gross intoxication, or other controlling influence, it cannot be said truthfully that his mind was fully conscious of its own purposes and deliberated or premeditated in the sense of the act describing murder in the first degree." *Answer.* "We affirm this point, with this qualification, that if the impulse that impelled him to do this deed was an impulse actuated by a bad and depraved mind and a heart fatally bent on mischief, then it would be murder. An impulse to kill, resulting from the wickedness and depravity of the heart, is the very essence of murder, but if the impulse to kill resulted from unsoundness of mind the act would not be murder, and the actor would not be held responsible by the law." (8th assignment.)

The court charged the jury, inter alia, as follows :

"The legal presumption of innocence stands until it is overthrown by proof. The commonwealth, in all cases, must prove everything that is necessary to constitute the crime ; prove it fully and clearly to the satisfaction of the jury, beyond a reasonable doubt. If the commonwealth fails to make out any of the necessary parts of the crime, the result of it is, that the jury must acquit the defendant ; or if the evidence, after it is all heard by the jury, leaves the question of the guilt of the prisoner in doubt, so that it is difficult to determine whether he is guilty or not, that doubt must work the acquittal of the defendant. The law says it is better that ninety and nine guilty persons should escape, than that one innocent person should be unjustly convicted and punished. The doubt that can work the acquittal of a prisoner must be a reasonable doubt ; such a doubt as would make a man of ordinary intelligence and prudence hesitate before coming to a conclusion. If such a doubt exists, of course it must work the acquittal of the prisoner at the bar.

[Nevling *v.* Commonwealth.]

If you, under your oaths, and after an examination of all the evidence in the case, find that such a doubt exists as to the guilt of the defendant, it must enure to his benefit, and your verdict should be not guilty. [But a jury cannot justify a verdict of acquittal upon any pretended or fancied doubt; it must be a real doubt, a reasonable doubt. You can not doubt as jurymen while you believe as men. I have heard men who have sat on juries in criminal cases, after they had rendered a verdict of not guilty, say, that they believed the man was guilty, but the Commonwealth had not proved it. This is a great error, for if you believe a man is guilty solely from the evidence, the Commonwealth has proved it; for if the evidence satisfied them as men that the prisoner was guilty, it is proved; and it is their duty as jurors to convict; it is what the law requires. Whenever all of the evidence is of such a character as to convince the intellect and conscience of men of a fact, then that fact is proved. Proof is that degree and quantity of evidence that produces conviction.] (First assignment of error.)

"The law presumes all persons above the age of fourteen years to have ordinary mental capacity, and to be capable of judging of the nature and character of their acts, and of intending the ordinary and necessary consequences of what they do. This presumption is not, however, conclusive. It may be overthrown by evidence, that any particular person is an exception to the general rule. When idiocy, lunacy, insanity, or any other form of mental incapacity is alleged as an excuse for a crime, the burden of proof is upon the defendant to show that such infirmity actually exists. The unsoundness of mind may be general, reaching all subjects, when it is called idiocy, or general insanity; or it may extend only to particular subjects, when it is called monomania.· It may be continuous, or it may be intermittent, in which latter case, it generally is called lunacy. These various forms of unsoundness of mind in some cases may have existed from infancy; in other cases, may have been subsequently produced by physical injuries, disease, long continued dissipation, and many other causes not necessary to enumerate. [But, however, it may have originated, when it is shown to exist to such an extent as to destroy or seriously impair one's judgment or consciousness of right or wrong, it is a defence to any criminal charge. Whenever a person has sufficient mental capacity to distinguish right from wrong, to understand and appreciate the nature and character of what he does, and to judge of probable consequences of his acts, the law holds him criminally responsible for them, although he may, in some respects, be weak minded; that is, of less than the average mental capacity. But if the unsoundness of mind goes to that

[Nevling *v.* Commonwealth.]

extent of destroying his capacity to distinguish right from wrong, and disabling him from understanding the nature and character of his acts, and their probable and ordinary consequences, the law will not hold him criminally responsible for them.]    (Second assignment of error.)

["It is alleged, on the part of the defense, that Nevling went to bed about eleven o'clock that night without taking any supper but a cup of coffee; that he remained in bed until after eight o'clock the next morning, when he got up, ate no breakfast, but he drank a pint of whiskey and a half-pint of alcohol, in which was dissolved an ounce of gum camphor, and then started to town, taking his gun with him, with which he afterwards fired the fatal shot.]    (Third assignment of error.)

["If, for a time previous to the killing, he was at himself and knew what he was saying and doing, and contemplated the taking of life, and if he was capable of discerning between right and wrong, and then willfully put himself under the influence of liquor or drugs, to stupefy his senses in order to carry out that design, he would in law be responsible for the act, and it would be the duty of the jury to convict him of murder in the first degree, but if he was so much intoxicated at the time he formed the design, or had the impulse to kill, as to be unconscious of what he was doing, and of the consequences which would follow, and continued in that condition until he carried his design or impulse into execution, he would not be criminally responsible for his act.]    (Fourth assignment of error.)

"If you find, from all of the evidence in this case, that he made these threats to kill the deceased at a time when he was in such condition as not to know what he was doing, but afterwards, when he had recovered his consciousness, he formed the design to kill and carried it into execution, he would be responsible for the consequences of his act.    You have also, bearing upon this subject, the condition of his mind immediately after he had fired the fatal shot; what he said and what he did. You remember the evidence what he said about it, and what anxiety he felt to be protected from the crowd who threatened to lynch him, and why he wanted to be protected; the fact that he was taken into Wooden's Hotel away from the crowd, and all he said there, and the condition he remained in during the day, while in the custody of the constable, John Malee, and what he said when Malee put his hand-cuffs on him.    All of this is proper evidence for you to consider in determining whether he was in such a condition as to know what he had done, and whether he knew the consequences of his act.    If he was in such a condition as to know what he was doing, and

knew the consequences of his act, and did it in pursuance of a previously formed determination, then the law says he is guilty of murder in the first degree, but if he did the act without deliberation and premeditation, then he would be guilty of murder in the second degree.

["In this case the only one question arises, and the only one disputed by the defendant's counsel, is whether the defendant was in such a condition as to be capable to form a design to kill, and did kill in the pursuance of that design.] (Fifth assignment of error.)

"If he was capable to form such a design, and killed the deceased deliberately and with premeditation, and was conscious of the consequences of his act, then the law says he was guilty of murder in the first degree, and it will be your duty, under your oaths, to render such a verdict, regardless of the consequences."

Verdict, guilty of murder in the first degree. A motion for a new trial and in arrest of judgment was refused, and sentence of death was pronounced. The prisoner took this writ of error, assigning for error the exclusion of his offers of evidence as above ; the answers to points, and the portions of the charge included within brackets, as above quoted.

*J. B. McEnally,* for plaintiff in error.—The sole question was whether the prisoner was guilty of murder in the first degree or in the second degree. The error pervading the theory on which the court below tried the case, and which pervades the charge, is that the prisoner should either be convicted of murder in the first degree or be acquitted. Thus, the court say (fifth assignment) : "In this case the only one question arises, and the only one disputed by the defendant's counsel is, whether the defendant was in such a condition as to be capable to form a design to kill, and did kill in pursuance of that design." The power to form a design and then follow it up, does not necessarily imply that kind of deliberation and premeditation which is, under the Act, necessary to constitute murder in the first degree. All the cases in Pennsylvania defining murder in the first degree use language *assuming* that the prisoner is sane and capable of premeditation. Such is the case of Commonwealth *v.* Drum, 8 P. F. Smith 9, upon which, and kindred cases, the court below based its instructions. If such language is applied to this case it is *assuming* the very question at issue here, viz. : whether the defendant's mind was in such a condition that he had capability to form a premeditated intent of murder. There are two elements of the test of responsibility for crime— power of self-consciousness, and power of self-control. A mind

[Nevling v. Commonwealth.]

may be removed from responsibility of murder in the first degree by heat of passion, by intoxication, and by insanity. Intoxication is not an excuse for crime, but if it deprives the intellect of power to think and weigh the nature of the act, it may prevent a conviction of murder in the first degree: Jones v. Commonwealth, 25 P. F. Smith 403.

The court below also erred in their statement of the law in other portions of the charge assigned for error; in the answers to points, which were obscure and calculated to mislead the jury; in the rejection of evidence; and in the general tenor of the charge: Wharton's Crim. Ev. §§ 1, 72, 73; Penna. R. R. Co. v. Berry, 18 P. F. Smith 272, 279. It is possible that even if the court had made no error, the jury might still have found the same verdict, but we were entitled to correct rulings, and in their absence are now entitled to a reversal.

*J. F. McKenrick*, district-attorney (*Wm. M. McCullough* with him), for the defendant in error.

Mr. Justice GREEN delivered the opinion of the court October 3rd 1881.

The learned counsel for the plaintiff in error candidly admits that his client was guilty of murder, and questions only the propriety of the conviction as to the degree of the crime. As the facts, and the degree of the offense, have been found by a jury, and there was abundant evidence to warrant the finding, we are precluded from considering the sufficiency of the testimony, and are limited to the precise and specific determination of the matters assigned for error.

The case in all its leading features was one of a very simple character and quite free of complicated questions. On the night of February 16th 1880, the prisoner and the deceased met at a store in Houtzdale and after a few words went out on the street, apparently to fight. A brief contest took place, in which Pennington, the deceased, struck Nevling, the defendant, with a billy, and also a few blows with his fist while Nevling was on the ground. Pennington then desisted from further assaults, and at the instance of the defendant they shook hands. But on the same evening, to a number of different persons, Nevling made threats that he would shoot Pennington the next day. The proof of these threats was so conclusive and came from so many different sources, that there was no attempt to contradict or impeach it in any manner. On the next morning Nevling armed himself with a loaded gun and went out upon the streets of ·Houtzdale until he met Pennington, who approached from an opposite direction and passed Nevling in perfect peace and

[Nevling *v.* Commonwealth.]

quietness. No words passed between them, nor was there any demonstration of any kind on the part of Pennington toward the prisoner. Almost immediately after passing Pennington, Nevling turned about, lifted his gun, aimed it at the deceased, fired it off, and shot him in the back, inflicting wounds from which he died. After the shooting the prisoner declared he had done just what he intended to do, and expected to hang for it. One witness, Mr. W. H. Patterson, a member of the bar, who was present immediately after the shooting, testified as follows to a declaration made by Nevling in reply to a question put by the witness. " He said on the night before that Pennington struck him on the head with a billy, and that was the reason that he shot him, and that he well knew that he would hang for it any how, and that he didn't care." The uncontradicted testimony disclosed a case in which a previous motive of revenge was shown to exist, threats were made the night before, and repeated the next morning, to shoot the deceased, which were followed by a preparation in accordance with the threats, and the deliberate consummation by the actual perpetration of the crime, in circumstances which were entirely devoid of extenuation or even of provocation. In such a condition of things the ordinary defences against accusations of murder were quite out of the question. An attempt to set up insanity was made, but it failed entirely for want of testimony. The only serious effort that was made on behalf of the defendant, was an endeavor to reduce the grade of the crime from the first to the second degree. This was based upon an allegation that the prisoner was in a condition of gross intoxication at the time of the offence, that he had long been of intemperate habits, and that his mind was in such a condition that, while he was criminally responsible for his act as an act of murder, yet it was not " fully conscious of its own purposes," and did not deliberate or premeditate in the sense of the act describing murder in the first degree. It was argued that at the time of the commission of the offence the defendant did not possess " the self-determining power which, in a sane mind, renders it conscious of the real nature of its own purposes and capable of resisting wrong impulses." The decision of this court in the case of Jones *v.* Commonwealth, 25 P. F. S. 403, is the basis upon which it was sought to found this defence. An examination of that case, however, shows that the conclusion there reached was based upon the peculiar facts exhibited by the testimony, and was limited to the inferences which naturally arose from them. As the defendant had plead guilty it became necessary for the court to determine the degree of the offence, and this was done upon a consideration of all the facts of the case. The controlling facts are thus indicated in the opinion de-

livered by Chief Justice Agnew: " William S. Jones had been upon bad terms with his wife, she had become too intimate with another Jones called Charley. William S. Jones, failing to break off the association, got to drinking hard, and, finally after another quarrel with his wife on the 10th of June 1871 attempted suicide by taking a large quantity of laudanum. Dr. Davis found him lying on a lounge, partly insensible, eyes nearly closed, pupils contracted, and face disclored by congestion. Energetic remedies were used and he was so far restored as to be out of danger, but the effects of the laudanum remained. From this time until the night of the 19th of June, when he took the life of Mrs. Hughes, his mother-in-law, he was in a constant state of nervous excitement, continued drinking and had bottles of laudanum about his person. Many witnesses describe him as without sense, constantly talking nonsense, wild in appearance, and incoherent in speech. Some say he acted like a man drinking hard, was intoxicated, and once fell from a horse. Others described him as looking crazy, talking to himself, his hands going, his head thrown back, walking to and fro, throwing his head about, swinging his arms, and wild, nervous and excited. He would jump upon a chair and begin to preach and run off upon Charley Jones and his wife ; said he was going to build a tavern on the mountain and a church beside it; claimed all the prop-, erty about, and was evidently much out of the way. These appearances were particularly noticed on the 19th day of June, the day of the homicide." The foregoing facts, together with the consideration that Jones had been on pleasant terms with his mother-in-law, had made no threats against her, and had shot her under a sudden impulse after she had raised a stool, telling him she would level him with it if he did not leave, induced this court to believe that it was "a matter of grave doubt whether his frame of mind was such that he was capable of deliberation or premeditation." The facts in the foregoing case were so radically dissimilar to those of the case under consideration, that they constitute no precedent to be now followed. The principles stated in the opinion, which were supposed to be applicable, were presented to the court below, on the trial of Nevling, in the form of points, and the answers to these, and certain language in the general charge, constitute the subjects of the principal assignments of error. We proceed to refer to them in their order.

The first assignment complains of a portion of the charge relating to the character of the doubt requisite to justify an acquittal. We see no error even in the selected sentences which are claimed to be erroneous. When taken in connection with the other comments of the judge on the same subject, not

embraced in the specification, it is quite plain that the charge is not obnoxious to the criticism made upon it. The learned judge, in immediate precedence to, and in direct connection with, the language complained of, had defined with great care and perfect legal accuracy, the duty of the Commonwealth to establish the prisoner's guilt, " by clear and satisfactory evidence beyond a reasonable doubt;" that "the Commonwealth in all cases must prove everything that is necessary to constitute the crime, prove it fully and clearly to the satisfaction of the jury beyond a reasonable doubt. If the Commonwealth fails to make out any of the necessary parts of the crime, the result of it is, that the jury must acquit the defendant : or if the evidence, after it is all heard by the jury, leaves the question of the guilt of the prisoner in doubt so that it is difficult to determine whether he is guilty or not, the doubt must work the acquittal of the defendant." The learned judge then proceeded to say that the doubt must be a reasonable one, and that jurymen could not doubt as jurymen what they believed as men. In all this there was no error. It is the familiar language found in the text-books and decisions which treat of the subject. The whole language of the judge must be taken, together and we fail entirely to perceive any tendency to mislead the jury, or to lower the grade of proof required to convict.

There was certainly no error in the language complained of in the second assignment. It was a mere general description of the mental capacity which subjects individuals to responsibility for their criminal acts, and of the incapacity which relieves them of that responssbility. It is not alleged that there was any positive error in this portion of the charge, but is rather argued that there was error by implication in leading the jury to suppose that there were but two classes of men, either those wholly sound and therefore responsible, or wholly unsound and therefore entirely irresponsible. We see no such meaning in the language of the judge, and we think what was said was quite pertinent to the case.

There is no merit in the third assignment, and it is not really pressed.

As to the fourth assignment the learned counsel for the plaintiff in error admits that there was no error in what was said by the judge. It was indeed a most favorable presentment of the defendant's theory. But it is said, as before, that the jury were not herein instructed as to the difference in the grades of the offence. Granting this, it proves nothing as to the erroneous character of this portion of the charge. The judge was not bound to be constantly presenting that one view of the case.

[Nevling v. Commonwealth.]

It was not an answer to a point, but a part of the general charge, and was strictly correct.

The subject-matter of the fifth assignment is the statement by the court in an isolated sentence as to what the question was which was in dispute. The court stated it to be, " whether the defendant was in such a condition as to be capable to form a design to kill and did kill, in pursuance of that design." This was said at the end of an extended presentation of that part of the case which related to the condition of the defendant at the time of making the threats, and at the time of the shooting. After referring to the testimony as to the intoxication of the defendant, the court said to the jury : " It becomes an important question in the case for you to determine whether or not he was in a condition to know and understand what he was saying and doing when he made these threats." This was followed by the statement that if the defendant was, so drunk as to be unconscious of the meaning of the threats, they were of no account, but if he knew and understood their meaning, and if he carried them into execution, this would be evidence of deliberation and premeditation. After much further comment on this branch of the case, and with ample reference to the testimony, the judge further said : " All of this is proper evidence for you to consider in determining whether he was in such a condition as to know what he had done, and whether he knew the consequences of his act. If he was in such a condition as to know what he was doing, and knew the consequences of his act, and did it in pursuance of a previously formed determination, then the law says he is guilty of murder in the first degree, but if he did the act without deliberation and premeditation, then he would be guilty of murder in the second degree." Immediately following this is the language complained of in the fifth assignment. It seems to us to be a substantial statement of the essence of the controversy. What positions may have been taken in the oral argument of course we cannot tell—we can only deal with the record as we find it. There certainly is no error in anything the court said in presenting this part of the case. Whether there was any error of omission we cannot know except by the points and the answers to them. We fail to see anything in the facts of this case as developed by the testimony, to call for any more refined distinctions as to the defendant's mental condition, than those which were contained in the charge and answers. The jury were instructed to find a verdict of murder in the second degree if they found the killing was done without deliberation or premeditation, and that was as favorable a presentment of that aspect of the case as the defendant could ask.

There was clearly no error in the sixth assignment. Every

thing in the defendants' second point was affirmed. The added remarks of the judge were entirely correct in every legal sense, and were but a seasonable precaution to be given to the jury in connection with the matter contained in the point. The defendant did not ask in the point for a distinction between the two degrees of murder, and therefore there was no error in not giving it. He only asked for an instruction that if the hypothesis of the point were true, he would not necessarily be guilty of murder in the first degree, and that was affirmed. The alternative of the proposition was also stated by court, and stated correctly.

As to the seventh assignment it must be admitted that the answer of the court to the defendant's third point was obscure. But obscurity is not necessarily error. The only facts stated in the point are those which are essential to conviction, and if these are the facts to which the court referred in the answer, there was not only no error in the answer, but. it was a more emphatic expression in favor of the defendant than the point itself. This indeed is the literal interpretation of the words of the answer. If, however, the judge referred to the implied facts—implied from the negative form of the point, to wit, that the jury must acquit, or convict of something less than murder in the first degree, if they should find that the defendant did not possess the self-determining power which, in a sane mind, renders it conscious of the real nature of its own purposes and capable of resisting wrong impulses, then also the answer was correct in a legal sense, and the qualification, while it was unnecessary, did no harm. In either aspect there was no error in the answer.

As to the eighth assignment it is only necessary to say that the defendant's fourth point was affirmed, and that the qualification added is in exact conformity with the distinction stated by Ch. J. Agnew in the case of Jones *v.* Commonwealth. In fact the fourth point is a literal copy of one sentence in Judge Agnew's opinion, and the qualification is a substantial copy of the next sentence. The learned judge of the court below simply followed the example of the chief justice in presenting the qualification in immediate connection with the doctrine. Of course, there was nothing erroneous in what was said, nor any thing tending to mislead.

Ninth assignment. In no point of view was it competent to give in evidence the declaration of Pennington to Glasgow on the 14th of February. It was no part of the res gestæ, it was not alleged that the declaration was even communicated to Nevling, and it was altogether inapt to a defence of mental incapacity. Had there been any evidence of an affray at the

[Nevling v. Commonwealth.]

time of shooting and had the threat, such as it was, been communicated to Nevling, it might have been admissible though of but little real weight in the case. But in the actual circumstances of this case, it was totally irrelevant, and could have subserved no proper purpose in the trial of the cause.

Tenth, eleventh and twelfth assignments. The question to Weible was asked to show the actual condition of Nevling just before the shooting. The witness had detailed the circumstances of the conduct and language of the prisoner at his store, and had given his opportunities for knowing the mental condition of the defendant at that time. The fact of impaired mental condition of the prisoner, amounting to unconsciousness of his purposes, at the time of the shooting, was clearly competent to show by the witness, after proving the pertinent facts which occurred in his presence and hearing, whether such unconsciousness then existed. This is matter of every day practice in issues touching the sanity or capacity of persons. The opinion is competent if preceded by proof of actual facts affording opportunities of observation and inference. But the questions to Mr. and Mrs. Scott were entirely different in their character. They did not relate to the prisoner's *actual* condition at the time of, or immediately before or after, the offence; they were purely hypothetical, and they assumed as their basis a state of facts which was altogether disputed. Whether the prisoner was sane or insane when intoxicated was a mere general question, a pure matter of opinion, and the answer to it could not prove any thing as to his actual mental condition at the time of this occurrence. Both the witnesses were permitted to, and did, testify, to any facts within their knowledge as to the conduct and declarations of Nevling when he was intoxicated. Both of them said they did not see him on the day of the shooting, and of course they did not know whether he was then intoxicated or not. The offer to prove their opinions in such circumstances was clearly inadmissible.

The thirteenth assignment alleges a general tendency to mislead the jury in the charge. We have read the charge very carefully, and also the testimony delivered on the trial, and we are unable to observe any such tendency. On the contrary, it seems to us to be a very correct, fair and impartial presentment of the law and the facts of the case. The chief complaint of the defendant under this assignment is that the court did not adequately present, and explain, to the jury the subject of a conviction of murder in the second degree. It is but fair to the court to say that none of the defendant's points exhibited that question as an alternative, so as to require any special illustration of it. In some of the points it is claimed there could not

2 OUTERBRIDGE—22

[Ettinger *v.* Commonwealth.]

be a conviction of murder in the first degree, but the alternative of a conviction in the second degree was not suggested, and therefore, so far as the points are concerned, it does not appear that the distinction now contended for so earnestly was presented to the attention of the court. What may have been said in the oral argument, of course we do not know. So long as there was a chance of acquittal, it may not have been good policy to put in the point the suggestion of a conviction in the second degree as the alternative for a non-conviction in the first degree, but the court below could not be responsible for such omission. The points were properly answered, and the general charge was a correct and fair presentation of the whole case, and hence we cannot reverse.

Judgment affirmed, and it is ordered that the record be remitted to the Court of Oyer and Terminer of Clearfield County for the purpose of execution.