[File No. Cr. 214]

THE STATE OF NORTH DAKOTA, Respondent, v. CLARENCE MAGRUM, Appellant.

(38 NW2d 358)

Opinion filed June 13, 1949

*Strutz & Jansonius,* for appellant.

*Nels G. Johnson,* Attorney General, and James A. Clement, State's Attorney, for respondent.

BURKE, J. On November 27th 1935, in the District Court of Adams County, the defendant, Clarence Magrum, pleaded guilty to the crime of murder in the first degree. Judgment was entered pursuant to such plea and the defendant was sentenced to life imprisonment in the state penitentiary. On October 9th 1947, the defendant filed a motion in the same action, to set aside the judgment of conviction rendered against him, for permission to withdraw his plea of guilty, and for a new trial. The motion came on for hearing on February 13th 1948, before the Hon. G. Grimson, District Judge, sitting by request of one of the Judges of the District Court of Adams County. Thereafter the district court made and entered an order denying the motion and the instant appeal is from that order.

The grounds upon which the defendant asked relief are:

1. That the Judgment of Conviction was obtained by fraud and deceit, and is therefore, absolutely void.

2. That the defendant was not accorded the right of assistance of counsel, as guaranteed by the Constitution of the United

States and the Constitution of the State of North Dakota, and that therefore, the imprisonment of said defendant is illegal.

3. That defendant was not informed of his Constitutional rights by the trial court, as provided by Law, and the Constitution, and was not apprised of the consequences of his act in pleading guilty to the charge preferred against him, and that therefore, the imprisonment of the defendant is illegal.

4. That no Clerk of Court was present at the time the defendant was brought before the Court for trial, and sentenced, and said court was not a duly constituted Court to try this defendant.

Although no question is raised as to the propriety of the procedure followed by the appellant in the district court, we believe we should state, that even though the statutory time for making a motion for a new trial had expired, the remedy by a motion to set aside the judgment, made in the action in which the judgment was rendered, is available to the defendant when the grounds of his motion are that the judgment was obtained by fraud or under such circumstances that the court was without jurisdiction. This has long been the rule in this state in civil actions. Yorke v. Yorke, 3 ND 343, 55 NW 1095; Williams v. Fairmount School Dist. 21 ND 198, 129 NW 1027; Lamb v. King, 70 ND 469, 296 NW 185; Baird v. Ellison, 70 ND 261, 293 NW 794; Schillerstrom v. Schillerstrom, 75 ND 667, 32 NW2d 106, 2 ALR2d 271. While the rule has never been applied in criminal actions, the reasons for its application there are more cogent than for its application in civil actions. The power to grant such relief is inherent in courts of general jurisdiction. Williams v. Fairmount School District, supra. In a criminal case the motion is analogous to an application for a writ coram nobis. People v. Reid, 195 Cal 249, 232 P 457, 36 ALR 1435; People v. Paysen, 123 Cal App 396, 11 P2d 431; People v. Lyle, 21 Cal App2d 132, 68 P2d 378.

If the evidence adduced by the defendant at the hearing established the facts set forth in his motion as grounds for relief he is entitled to have the motion granted. In People v. Campos, 3 Cal2d 15, 43 P2d 274 it was said:

"Where on account of duress, fraud, or other fact overreach-

ing the free will and judgment of a defendant he is deprived of the right of a trial on the merits, the court in which he was sentenced may after judgment and after the time for appeal has passed, if a properly supported motion is seasonably made, grant him the privilege of withdrawing his plea of guilty and of reassuming the situation occupied by him before plea of any kind was entered. People v. Schwarz, 201 Cal 309, 314, 257 P 71." See also State v. Calhoun, 50 Kan 523, 32 P 38, 18 LRA 838, 34 Am St Rep 141; Sanders v. State, 85 Ind 318, 44 Am Rep 29; Re Ernst, 179 Wis 646, 192 NW 65, 30 ALR 681.

It is also clear that the failure of a trial court to provide an attorney for a defendant upon his arraignment may in some instances deprive the defendant of "due process of law" under the 14th Amendment to the Federal Constitution and thereby render the judgment against him void. This is so if the conviction and incarceration are "offensive to the common and fundamental ideas of fairness and right." Betts v. Brady, 316 US 455, 472, 86 L ed 1595, 1607, 62 S Ct 1252. See also Bute v. Illinois, 333 US 640, 92 L ed 986, 68 S Ct 763. Recently in the case of Uveges v. Pennsylvania, 335 US 437, 93 L ed 127, 69 S Ct 184, the Supreme Court has made clear the views of its members upon the question of when a failure to furnish counsel to a defendant in a criminal case "is offensive to the common and fundamental ideas of fairness and right." In the decision in that case it was held:

"Some members of the Court think that where serious offenses are charged, failure of a court to offer counsel in state criminal trials deprives an accused of rights under the Fourteenth Amendment. They are convinced that the services of counsel to protect the accused are guaranteed by the Constitution in every such instance. See Bute v. Illinois, 333 US 640, dissent, 677–679, 92 L ed 986, 1006, 1007, 68 S Ct 763. Only when the accused refuses counsel with an understanding of his rights can the court dispense with counsel. Others of us think that when a crime subject to capital punishment is not involved, each case depends on its own facts. See Betts v. Brady, 316 US 455, 462, 86 L ed 1595, 1601, 62 S Ct 1252. Where the gravity of the crime and other factors—such as the age and education of the

defendant, the conduct of the court or the prosecuting officials, and the complicated nature of the offense charged and the possible defenses thereto—render criminal proceedings without counsel so apt to result in injustice as to be fundamentally unfair, the latter group hold that the accused must have legal assistance under the Amendment whether he pleads guilty or elects to stand trial, whether he requests counsel or not. Only a waiver of counsel, understandingly made, justifies trial without counsel."

While there is a division of opinion among the members of the Supreme Court of the United States upon the question of when a failure to provide counsel to a defendant in a criminal case violates the due process clause of the 14th Amendment, they are unanimous that in a case of this nature, where in the crime charged, there are several included offenses of a lesser degree, where the defendant is a youth of 19 years and his education is scant and where it is contended that the conduct of the prosecuting officers justifies an inference that they were seeking to protect other persons who were to some extent involved in the crime, the failure to provide counsel does constitute a violation of the due process clause in the absence of an effective waiver.

In order for a waiver of counsel to be effective it must be freely and understandingly made. In his separate opinion in Von Moltke v. Gillies, 332 US 708, 729, 92 L ed 309, 323, 68 S Ct 316, Justice Frankfurter stated:

"Of course an accused 'in the exercise of a free and intelligent choice, and with the considered approval of the court . . . may . . . competently and intelligently waive' his right to the assistance of counsel guaranteed by the Sixth Amendment. Adams v. United States, 317 US 269, 275, 87 L ed 268, 272, 63 S Ct 236, 143 ALR 435; and see Patton v. United States, 281 US 276, 74 L ed 854, 50 S Ct 253, 70 ALR 263; and Johnson v. Zerbst, 304 US 458, 82 L ed 1461, 58 S Ct 1019, 146 ALR 357. There must be both the capacity to make an understanding choice and an absence of subverting factors so that the choice is clearly free and responsible. If the choice is beclouded, whether by duress or misleading advice, however honestly of-

fered by a member of the prosecution, a plea of guilty accepted without more than what this record discloses can hardly be called a refusal to put the inner feeling of innocence to the fair test of the law with intelligent awareness of consequences."

The burden of proof is of course upon the defendant to establish the facts upon which he relies as a basis for relief. Betts v. Brady, 316 US 455, 86 L ed 1595, 62 S Ct 1252, supra. It is therefore necessary for us to review the evidence in detail and to determine what facts are established.

In the fall of 1935, Clarence Magrum then nineteen years of age was employed by his brother, Bernard Magrum, upon a farm near Reeder in Adams County. Carl Wilson lived upon a farm some sixteen miles distant from the Magrum Farm. Bernard Magrum and Carl Wilson were married to sisters whose maiden name was Mueller and Clarence Magrum was engaged to another sister, Irene Mueller. On November 12, 1935, Mrs. Carl Wilson left home to visit at the home of her mother, Mrs. George Mueller. There is no question but that at this time Mr. and Mrs. Wilson were having serious marital difficulties and that Mr. Wilson denied the paternity of an expected child. On Sunday November 17th, Wilson came to the Mueller home. While there the quarrel between him and his wife was renewed and apparently was participated in by Mrs. Mueller and Irene. On the same day Clarence Magrum was also a visitor on the Mueller Farm. At about four o'clock in the afternoon Wilson left the Mueller Farm to go home. Shortly thereafter Clarence Magrum left the Mueller Farm. About four hours later Clarence returned and remained at Mueller's home until eleven o'clock in the evening. On November 22nd Mrs. Wilson left the Mueller Farm to go home. When she arrived there her husband was absent and the house was in disorder. She found blood spattered on a wall and on the floor of one room in the house. The cattle and other livestock on the place had not been cared for. She called Mr. Wilson's brothers who after an examination of the premises notified the sheriff of their condition and of the absence of Carl. When the sheriff arrived he found that a window of the room in which the bloodstains were found, was broken and opposite the break in the

window a hole in the screen. He also found a discharged twenty gauge shot gun shell lying in the yard. After an organized search the body of Carl Wilson was found in a field at some distance from his home at four o'clock in the afternoon of November 24th. He had died of wounds inflicted by the discharge of a shot shell. Suspicion was immediately directed toward the Magrums because Bernard Magrum was the only person among Wilson's acquaintances who was known to possess a twenty gauge shot gun.

A coroner's inquest was held, commencing on the morning of November 25th. Bernard and Clarence Magrum were both subpoenaed as witnesses, but not at the same time. Bernard testified first, and on his way home to the farm, he met Clarence and the sheriff coming into town. Clarence was the last witness heard by the jury on the evening of the 25th, and the first witness on the morning of the 26th. During the intervening night he was held in jail as a material witness. In his testimony he denied all knowledge of Wilson's death and specifically denied that he was at Wilson's home on November 17th or that he had used his brother's shot gun on that day. He stated that he did not have this gun with him when he returned to the Mueller Farm that evening. At the close of the coroner's inquest the record shows the following: "Mr. Thompson: (Assistant Attorney General and Special Prosecutor) I will ask the court's pardon we are just waiting for a witness." (The Coroner, the Coroner's Jury, the reporter and Mr. Thompson then retired to the office of the State's Attorney where the following proceedings were had.)

Irene Mueller was called for further examination:

Mr. Thompson: "Now Gentlemen, we have promised this girl that we are not going to put one word of this in the record until the entire case is disposed of.

Mr. Martinson: (Special Investigator appointed by the Governor of the State) And further I have promised to protect this girl and this lady here—this lady knows nothing about it, and further I have promised this girl's mother that I would be 100 percent square with her and stand right behind them.

Mr. Thompson: We will do everything we can do in accordance with being honest officials.

Mr. Thompson: Q. Now after we talked with this young lady as to whether or not she had any suspicion as to who was the guilty party, you immediately stated who?

A. Clarence Magrum.

Q. And we also asked you why you suspicioned him and you stated that he brought the shot gun along on the second trip—isn't that true?

A. Yes.

Q. And that was the time he came to your house on that Sunday, the second time that day?

A. Yes.

. . . . . . . . . . . .

Mr. Thompson: Now as Mr. Martinson has stated here and as I don't want to violate any confidence, we are not going any further than that until Chris (Martinson) and I have had a chance to talk with Clarence to see what he has to say and with the testimony you have just heard I don't believe there is any doubt in your mind that there is probable cause for holding Clarence Magrum and with the state of the record as it now is, I believe you are satisfied that you have performed all the duties of a Coroner's Court—isn't that true?

The Jury: Yes.

Mr. Martinson: The rest is really a matter for you local officers to handle from now on unless you feel that there is something more we should probe into, but this young girl has been so truthful and fair with us I feel no further investigation should be proceeded with as to either of these women (Irene Mueller and her sister, Mrs. Wilson) is that all right?

The Jury: Yes."

The coroner's inquest was concluded at about four o'clock P. M. on November 26th.

In the meantime when Clarence Magrum had not returned home on the night of the 25th, his brother, Bernard, became apprehensive concerning his welfare. He drove to town to find out what had happened. He called at the State's Attorney's

office and asked to see his brother. He was told that he could not see him at that time but to wait in the courthouse lobby. On several occasions during the afternoon and early evening he repeated his request to see his brother but each time he was denied permission.

At eight o'clock in the evening of November 26th, Clarence Magrum was brought before a magistrate upon a complaint charging him with the crime of murder in the first degree. The record of the magistrate contains the statements that the defendant was "instructed as to his rights and that under the law he was entitled to counsel if he so desired. The defendant in open court stated that he did not wish any counsel and inquiry elicited the fact that he wished to waive preliminary examination and enter his plea immediately." The defendant was thereupon bound over to answer the charge in the district court.

An information charging the defendant with the crime of murder in the first degree was immediately filed in the district court and the defendant was arraigned upon the charge at nine o'clock in the evening of the same day. The record upon the arraignment in so far as we consider it pertinent follows:

"By the Court: You have been arraigned upon an information which has been read to you. Do you understand the contents thereof?

A. Yes sir.

By the Court: You know that you have been charged with the crime of murder in the first degree, you understand that do you?

A. Yes sir.

By the Court: Do you also understand that you have a legal right to hire an attorney and fight this case through the courts?

A. Yes sir.

By the Court: Do you wish to do that?

A. No sir.

By the Court: Very well, I will ask you whether you are guilty or not guilty as charged in the information of murder in the first degree—are you guilty or not guilty?

A. I am guilty.

By the Court: Now Mr. Magrum what have you to say for yourself in this case?

A. Why I should do it you mean?

By the Court: Yes, if you have any reason which you think might have some bearing on the case, or which you believe might have—have you anything like that?

A. Yes, that is—there.

By the Court: Speak freely if you want to—go ahead and talk if you like.

A. The reason I did this is because he wouldn't have to treat his family the way he did, his wife would have to suffer a lot more than he did—he didn't treat her right and I thought I would save his family."

Mr. Moen, the State's Attorney, then made a recommendation that the Court in passing sentence take into consideration the fact that the defendant had pleaded guilty.

Mr. Thompson stated "among other things I told him that under the facts existing in the case . . . I couldn't say anything to Your Honor that would influence you . . . but later on, if the facts justify, I would not be averse to making a recommendation to the Pardon Board."

Mr. Martinson stated: "Well, Judge, I can't say much more, only that the boy having plead guilty to such a crime, I can't recommend any leniency at this time. At a later time when he comes before the Pardon Board there might be a way of helping him. He was very tough on the start but finally came through with the truth after I got some very fine assistance from his girl friend and the wife of the deceased. . . ."

Thereafter the defendant stated: "I think mostly the officers treated me very kindly, especially Chief Martinson, and I am very sorry that I committed this crime and I am in hopes that if I ever come back in this country or if I had to do it over I would be a different man than I am now." The Court then sentenced the defendant to imprisonment in the state penitentiary for life. Upon hearing the sentence the defendant fainted and fell to the floor. A commitment was issued immediately and the defendant was transported to the penitentiary that night.

Shortly after the arraignment Bernard Magrum who was still trying to see his brother was told by a deputy sheriff that he was too late, that Clarence had pleaded guilty and was on his way to the penitentiary.

Prior to the arraignment, the defendant made a confession in which he stated that on the 17th of November, after he had left the Mueller Farm, he had followed Wilson home. He did not say how long he stayed at the Wilson place or what transpired on this visit. He then went to his brother's farm to do the evening chores. After the chores were done he put his brother's shot gun in the car and returned to Wilson's. His statement as to the shooting is as follows:

"I got the shotgun out and put it together and I put a shell in it and I went around to the northside of the north window and he was sitting in a rocking chair eating popcorn, and I stopped and thought to myself whether I should or should not and I decided on that for quite awhile. I raised the gun up and I thought no, I should not do it and I put it down again and I finally braced my nerve up enough to pull it. I pulled the gun up and shot him. I shot for his head so as to kill him." The confession contains the usual statements that it was made voluntarily and without any inducements or promises made or given by any person.

About a week after defendant entered the penitentiary, he wrote out a second confession, in which he gave his reasons for shooting Wilson and the details of an altercation with him on his first visit to the Wilson home on the 17th of November. As to his motives, he stated: "I did it, that's true, because I was asked to do it, and then for the defense of the parties that he threatened, including myself, which I barely escaped being slaughtered, because I tried to convince him he was doing wrong, by beating his wife, cheating her, kicking her away from home to get rid of what he was the cause of and because he tried to break up my marriage by forcing the girl to his desires."

At the hearing upon this motion the defendant testified that at the time he was questioned about the shooting of Wilson, there were present, Martinson the special investigator, Thompson, the special prosecutor, Moen, the state's attorney and Zenk,

the sheriff. They were not all present all of the time and upon occasions Martinson would call him aside and talk to him out of the hearing of the others. He stated that at no time during the questioning was he advised as to his right to counsel; that he asked permission to call his father and that permission was denied upon the ground that it would do him no good. He testified that his confession and agreement to plead guilty were induced by threats and promises. He stated that Martinson said "Carl Wilson has some tough brothers around and they was around town and if I didn't confess immediately and get taken out of town he would not be responsible for what happened." "He (Martinson) told me if I didn't confess he would really clamp the juice on me." "The sheriff told me that if I confessed that I would get about ten years." "Martinson said if I confessed and would do as he said I might get a short time in the reform school and that a girl friend, at that time the one I was going with—he said he would get her a job in the state capital where she could come out and see me often." "Martinson told me not to implicate anybody else in this crime and do as he said and give him a good recommendation, that he treated me swell and that would help me, and that he was going to help me in the future." Summing up his reasons for pleading guilty defendant said: "the first thing was the fear that was given to me over this person's brothers and I was led to believe that the quicker I got out of town the better it would be for me and the next thing was that I was only going to receive, since Mr. Martinson promised me all this, that I would do a little time in the reform school and that I wouldn't have to do much time and it would be the best thing for me. I didn't figure I had time to use (an attorney) because of the fear that was throwed into me."

Of the five persons who were present at the time defendant was questioned concerning this crime, Martinson and Moen are dead. Thompson lives in Montana, and Zenk in California. In Zenk's affidavit which was filed at the hearing on this motion, he stated he knew of no threats or promises that had been made to Clarence Magrum but that Mr. Martinson was in frequent private consultations with him.

The only direct evidence in the record concerning threats and promises is the testimony of Magrum, himself. That testimony should be scrutinized most carefully. It was given by Magrum after more than ten years confinement in the penitentiary. His interest in the result of this motion is great. He testified falsely at the coroner's inquest, held immediately after the discovery of Carl Wilson's body. These circumstances weigh heavily against his credibility. On the other hand there are circumstances which tend to corroborate his testimony.

There are the statements made by Thompson, the special prosecutor, and Martinson, the investigator, at the coroner's inquest. These statements justify the inference that both Mrs. Carl Wilson and Irene Mueller were in some manner involved in the crime and that the officers were anxious to keep the nature and extent of their participation from being disclosed. In fact Martinson said: "I have promised to protect this lady and this girl here." If the defendant were permitted to consult with a lawyer or if he stood trial it is quite probable that this promise could not be fulfilled. Thus we have a situation where the officers had a motive in securing a plea of guilty, that went beyond a desire to see that exact justice was done. To make good on their promises it was necessary that they should control what was said in any confession and to make sure that the defendant would make no embarrassing statements upon his arraignment. These circumstances are certainly consistent with the truth of defendant's statement that "Martinson told me not to implicate anybody else in this crime and do as he said and give him a good recommendation, that he treated me swell and that would help me and that he was going to help me in the future."

There are the statements made by Martinson and Thompson upon the arraignment. There, Thompson said he had told the defendant that he would not be averse to making a recommendation to the pardon board in his behalf and Martinson said "when he comes before the pardon board there might be a way of helping him." It is thus clear that during the conversations between these officers and the defendant prior to the confession the possibility of having the term of defendant's imprisonment shortened by a pardon was discussed, at least by the defendant

and Thompson and probably by the defendant and Martinson. In view of the trend that such a conversation would naturally take we cannot say that defendant's testimony, that definite representations were made to him as to the length of time he would have to serve, is untrue.

There is Martinson's statement that defendant "was very tough at first but he finally came through with the truth." This statement indicates that much persuasion was necessary to convince the defendant that he should plead guilty. There is of course a legitimate field of persuasion in matters of this kind but the statement suggests a persuasion that went beyond such limits and in view of the motive of the officers to protect other persons, of the fact that defendant had no counsel and was not permitted to see his brother we cannot say that defendant's testimony as to the nature of that persuasion is untrue.

Finally there is the unconscionable haste with which the defendant was rushed to the penitentiary. At four-thirty o'clock in the afternoon the coroner's inquest was adjourned. At eight o'clock in the evening defendant was taken before a magistrate where he waived a preliminary hearing. An hour later he was arraigned in district court and sentenced. A commitment was immediately issued and the sheriff set out immediately by automobile to transport his prisoner to the penitentiary, one hundred and fifty miles away, without giving him an opportunity to speak to his brother, who, the officers knew, had been waiting to see him since early afternoon. This behavior on the part of the officers of the law is consistent with defendant's testimony that Martinson had told him that "Carl Wilson had some tough brothers around and they was around town and if I didn't confess immediately and get taken out of town, he wouldn't be responsible for what happened." It is inconsistent with any reasonable conception of the administration of justice, particularly in a case where the charge was murder in the first degree.

The Attorney General in the argument of this case pointed to the facts that, at the arraignment, the defendant volunteered the statement that he had been treated fairly by the officers and that he made a second confession immediately after he was received into the penitentiary. He argued vigorously that

these two facts are completely out of harmony with defendant's testimony upon the instant motion, and that they sufficiently demonstrate that defendant's plea of guilty and waiver of counsel were voluntarily made.

Defendant's statement that the officers treated him well is not inconsistent with his present testimony. In fact it is improbable that a defendant "who was very tough at first but finally came through with the truth" would make such a statement except, as this defendant testified, as the quid pro quo of an agreement made with the officers. As the Attorney General says, the second confession does evidence a willingness to confess. Defendant still is willing to confess. He stated at the hearing upon this motion that the confession made after his arrival at the penitentiary was voluntarily made and that it is true. There is a difference between a willingness to confess a homicide and a willingness to plead guilty to the crime of murder in the first degree. There are several degrees of homicide. It is not to be expected that a nineteen year old boy with only an eighth grade education would be aware of the distinctions between them or of the penalties which each entailed. It follows that officers of the law should be most meticulous in a case of this kind to inform a defendant of the nature and consequences of the crime with which he is charged and of his rights under the constitution and the statutes.

We are satisfied from a consideration of all of the evidence in the case, that defendant's plea of guilty and waiver of counsel in this case were not freely and understandingly made. His choice was "beclouded" by duress, promises and misleading advice. It follows that the judgment and sentence against him are void. It is therefore ordered that the judgment and sentence against the defendant in this case be vacated, that the defendant be discharged from imprisonment under such judgment and sentence and that he be returned to the custody of the Sheriff of Adams County pending further proceedings in accordance with law.

THOM, JR., and PORTER, District JJ., concur.

CHRISTIANSON, J., disqualified, and BURR, J., did not participate.

544

MORRIS, J. (concurring). I concur in the determination reached in the opinion prepared by Judge Burke that the judgment and sentence rendered against the defendant are void. I would point up my concurrence with these comments. Section 13 of the North Dakota Constitution guarantees to a party accused of crime the right to appear and defend in person and with counsel. Supplementing this provision the legislature has provided that, "If a defendant appears for arraignment without counsel, he must be informed by the court that it is his right to have counsel before being arraigned and must be asked if he desires the aid of counsel. If he desires, and is unable to employ, counsel, the court must assign counsel to defend him. Counsel so assigned shall serve without cost to the defendant and shall have free access to the defendant, in private, at all reasonable hours while acting as counsel for him. Assignment of counsel shall not deprive the defendant of the right to engage other counsel at any stage of the proceedings in substitution of counsel assigned to him by the court. Failure to assign counsel before arraignment shall not affect the validity of any proceeding in the cause if it appears that the defendant was subsequently represented by counsel, whether assigned to him or of his own choosing, and that the defendant in fact was not prejudiced by such failure." § 29-1303, Rev Code ND 1943.

This section is in effect a legislative declaration of a minimum standard which the court must follow in order to afford to the defendant his right to counsel guaranteed by Section 13 of the Constitution. The incidents leading up to his appearance before the district court on arraignment are background against which we view the proceedings before the court in order to determine whether he was afforded the opportunity to freely exercise that right. The transcript of the proceedings discloses that after the information was read to the defendant by the state's attorney the following transpired.

"By the Court: Mr. Magrum is your name correctly spelled in the information?

A. Yes.

By the Court: You have been arraigned upon an information

which has been read to you, do you understand the contents thereof?

A. Yes.

By the Court: You know that you have been charged with the crime of murder in the first degree, you understand that do you?

A. Yes, sir.

By the Court: Do you also understand that you have a legal right to hire an attorney and fight this case through the courts?

A. Yes, sir.

By the Court: Do you wish to do that?

A. No, sir.

By the Court: Do you wish to plead at this time?

A. Yes, sir.

.By the Court: Very well, I will ask you whether you are guilty or not guilty as charged in the information of murder in the first degree—are you guilty or not guilty?

A. I am guilty."

Under our constitution and the statute above quoted it was the duty of the court to ascertain if the defendant desired counsel, not merely to fight the case through the courts, but to determine in the first instance whether the defendant should then and there enter a plea of guilty to first degree murder. The defendant did not want to hire an attorney. For aught the record shows he may not have been financially able to do so should he have so desired. The members of his family had no opportunity to communicate with him. He was thus deprived of their assistance and advice. When the proceedings are viewed in the light of the events preceding and surrounding the arraignment which are set out at length in the main opinion, I am satisfied that the defendant was not afforded the right to counsel for which our constitution and statute provides, nor did he freely and understandingly waive that right.

NUESSLE, Ch. J. (dissenting). I am unable to concur in the foregoing opinion. The determining question is as to whether the defendant Magrum freely and intelligently waived the right

to have counsel when the case was presented to and disposed of by the district court. It is true that the proceedings were regrettably hasty and brief. There should be no undue haste in disposing of a criminal cause. No plea of guilty should be received or sentence imposed thereon where the defendant appears without counsel until and after the court has informed him to the least detail of every right he has under the law and has explained fully and at length the consequences of the entry of his plea and the character of the sentence that may be imposed. But as I read the record in this case, in the light of all the circumstances disclosed at the time the motion to set aside the judgment of conviction was heard, the defendant had been well informed as to his right to have counsel and knowing that he had that right he deliberately waived it.

The defendant killed Carl Wilson. It was a cruel, calculated, cold-blooded killing. He does not deny it. He had a preliminary hearing. The magistrate before whom this hearing was held was also the official reporter of the district court. He was experienced in legal matters. He needs must have been fully conversant with the procedure on a preliminary examination and with the rights that a defendant charged with a serious offense possesses and should have an opportunity to enjoy. It appears from the record made on the preliminary examination that the magistrate advised the defendant as to his rights. Among other things he told the defendant he had the right to have counsel. He then inquired if defendant wished to have counsel. Defendant said that he did not but desired to waive examination and to enter his plea of guilty of the offense charged. Defendant was then examined by the prosecuting officer. He testified as to the killing and all its attendant circumstances. This testimony was transcribed and he signed the transcription saying that it was correct. He was then bound over to the district court on a charge of murder in the first degree. At once thereafter he was brought before that court for arraignment. The proceedings then had were as follows:

"By the Court: The Court will come to order. The defendant is present, Mr. Sheriff?

Sheriff Zenk: Yes, sir.

By the Court: Apparently the Clerk of Court is not present?

Mr. Moen: Mr. Burnson the Deputy Clerk of Court is here.

By the Court: Let the record show that the State moves the arraignment of the defendant, Clarence Magrum. Let the record further show that the State's Attorney is in Court, also the Deputy Clerk of Court, and also the defendant, and that a true and correct copy of the information has been served upon the defendant in open Court. Will the defendant please stand?

Mr. Moen: I will read the information.

By the Court: Mr. Magrum, is your name correctly spelled in the information.

A. Yes.

By the Court: You have been arraigned upon an information which has been read to you, do you understand the contents thereof?

A. Yes.

By the Court: You know that you have been charged with the crime of murder in the first degree, you understand that do you?

A. Yes, sir.

By the Court: Do you also understand that you have a legal right to hire an attorney and fight this case through the courts?

A. Yes, sir.

By the Court: Do you wish to do that?

A. No, sir.

By the Court: Do you wish to plead at this time?

A. Yes, sir.

By the Court: Very well, I will ask you whether you are guilty or not guilty as charged in the information of murder in the first degree—are you guilty or not guilty?

A. I am guilty.

By the Court: Now Mr. Magrum, what have you got to say for yourself in this case?

A. Why I should do it you mean?

By the Court: Yes, if you have a reason which you think might have some bearing in the case, or which you believe might have—have you anything like that?

A. Yes, that is—there—

By the Court: Speak freely if you want to—go ahead and talk if you like?

A. The reason I did this is because he wouldn't have to treat his family the way he did, his wife would have to suffer a lot more than he did—he didn't treat her right and I thought I will save his family.

By the Court: Do you know of any legal reason why I shouldn't sentence you at this time?

A. No.

By the Court: Mr. Moen, have you anything to say about this?

Mr. Moen: If the Court please, the defendant in this case had plead guilty and shows some disposition of taking the responsibility and serve such time as may be meted out to him for the crime that he has committed, and being considerate in that matter and thereby saving the county and the state considerable expense in the further prosecution of the case, and although the crime that has been committed is a very heinous crime and apparently a deliberate murder, I think he should be entitled to some consideration by reason of his plea of guilty— that is of course a matter for the Court to pass upon, and that is about all I wish to state at this time unless some of those associated with me would wish to express their views in reference to the matter.

Mr. T. A. Thompson: If the Court please, I appreciate the courtesy of Mr. Moen in giving me an opportunity to make a statement, but, Your Honor, it is one of those cases that after talking to this young man the crime is of such an abhorrent nature that when he asked me to plead for clemency in this particular case I told him that under the facts existing in the case I wouldn't say anything to Your Honor that would influence you because in my examination of this young man and the deliberate nature of the crime, in my best judgment it was not a matter wherein an attorney could make any particular recommendation and so far as I am concerned I would not make any, but later on, if the facts justify, I would not be averse to making a recommendation to the Pardon Board, but I do not feel in a deliberate crime like this that I should promise him that any

attempt would be made to influence Your Honor, and I am not going to at this time, . . . and I shall make no attempt to influence you, and I want you to understand, Your Honor, that no offer of attempt to influence or reward was offered to this young man. I might further say that I hold no malice toward him, and if, as I said before, his future conduct should justify a pardon or mitigation of his sentence I would not oppose it, . . . .

Mr. Martinson: Well, Judge, I can't say much more, only that the boy having pleaded guilty to such a crime I can't recommend any leniency at this time. At a later time when he comes before the Pardon Board there might be a way of helping him. He was very tough on the start but finally came through with the truth after I got some very fine assistance from his girl friend and the wife of the deceased, . . . .

By the Court: Is there anyone else here who has something to say?

Mr. Magrum: Could I have something to say, Your Honor?

By the Court: You may.

Mr. Magrum: I think mostly the officers treated me very kindly, especially Chief Martinson, and I am very sorry that I committed this crime and I am in hopes that if I ever come back in this country or if I had to do it over I would be a different man than I am now.

By the Court: Are you through now, Mr. Magrum?

Mr. Magrum: Yes, Your Honor.

By the Court: Let the record show that it is the judgment and decree of this Court that you, Clarence Magrum, be confined in the State Penitentiary at Bismarck for the rest of your natural life. In other words, you are sentenced for life. You are remanded to the custody of the Sheriff until the judgment is satisfied. That will be all, Gentlemen."

The theory of the prevailing opinion is that the defendant may not have understood what his rights were with respect to the matter of having the assistance of counsel, the court having told him that he had the right to hire counsel and fight the case through the courts. That he did not know that the court would

designate counsel for him if he had no funds with which to pay for such assistance. That had he known this was so he would not have answered as he did. That accordingly the requirement that the defendant in such a case should have counsel was not complied with. However, all the facts and circumstances belie this. He was nineteen years of age. He had an eighth grade education. He was not wholly inexperienced. He had been away from home on his own for two or three years. He had been in trouble before on account of some minor infractions of the law. He had been advised at the time of the preliminary examination of his right to have counsel. He had testified at the preliminary examination regarding the killing and the circumstances in connection with it. Almost immediately after the killing he went to his sweetheart, Irene, the sister of the dead man's widow, and told her what he had done. He also told the dead man's widow. He knew the authorities were aware of this and that Irene had told them what he had said. I have set forth above the record of the proceedings had when sentence was passed upon him. He heard what Moen, what Martinson, and what Thompson had told the court. And then he inquired if he might say something. Permission was granted and he said, "I think mostly the officers treated me very kindly, especially Chief Martinson, and I am very sorry that I committed this crime and I am in hopes that if I ever come back in this country or if I had to do it over I would be a different man than I am now."

It seems to me that considering all these things, his waiver of his right to have counsel was the natural and reasonable thing to do and that he was not prejudiced thereby. If he had been represented by counsel, an honest lawyer knowing the facts and circumstances could only have advised him that if he went to trial there was but the slightest chance that he would not be convicted of the charge laid against him; an unscrupulous lawyer might have suggested and tried to establish emotional insanity or an insane impulse as a defense, with a like result almost inevitable.

It is unfortunate that defendant's relatives were not informed as to his arrest and given an opportunity to consult with him before his plea was received and entered. However, almost at

once after the prison doors had closed upon him, his sister, his brother and his father visited him. They had ample opportunity to advise with him and to consult and employ counsel for him. In fact, it appears that his father did consult counsel. But the defendant waited more than twelve years before making the instant motion to set aside the judgment. In the meantime the witnesses were widely dispersed. In some instances their whereabouts was unknown. Martinson who aided in making the case against the defendant was dead. Moen, the State's Attorney who prosecuted the case, was dead. Thompson, who assisted the State's Attorney, was no longer a resident of the state. Sheriff Zenk had removed to and lived in California.

The defendant testified by deposition in support of his motion to set aside the judgment and for a new trial. This deposition was taken before the district judge who heard the motion. Defendant's memory was faulty as to some important details that were prejudicial to his cause. It appears, however, that some days after he was committed to the Penitentiary and after he had been visited by his father, his brother and his sister, he made a statement reaffirming in all material respects the facts to which he had testified at the preliminary examination. He testified in his deposition that this statement was freely and voluntarily made. He wrote it out himself. At his request it was rewritten by the Penitentiary authorities. He then signed it.

Judge Grimson, who heard the motion, is an able and experienced judge. He had an opportunity to observe the defendant when the deposition was taken and thus he was the better enabled to pass upon his intelligence and mental capacity, his credibility, and the weight to be given to his testimony. The court afforded the defendant every opportunity to fairly present his case and after a full hearing denied the motion. I think the order made in that behalf should be affirmed.