## Commonwealth *v.* Sheets.

*Criminal law—Murder—Confessions.*

Generally where a confession of guilt has been obtained from a prisoner by undue means it will be inferred that a confession of the same or like facts afterward made by him was induced by the same influences; and evidence of a second confession will not be received unless from the length of time intervening, or from proper warning of the consequences

| 197 | 69 |
| 198 | 60 |

| 197 | 69 |
| 205 | 4608 |

| 197 | 69 |
| 209 | 4469 |

| 197 | 69 |
| 216 | 4383 |

| 197 | 69 |
| f39SC²181 |

of confession or from other circumstances it appears that the influence which led to the first confession has been entirely removed. No general rule can define the facts which in all cases should be deemed to have influenced the mind of the prisoner, as matters which would readily affect the mind of one person would have no influence upon that of another. The age, character and situation of the prisoner, and all the circumstances under which the confession was made, are to be taken into consideration, and the question whether the original influence continues to operate must be left largely to the discretion of the trial judge, who hears the testimony, sees the witness and observes the conduct of the prisoner.

A prisoner after his arrest made a confession to a detective who asked him to make a full statement and promised that if he would do so he would befriend him. On the following day the prisoner made two confessions, one to the editor of a newspaper who had called to get any statement which the prisoner might care to make for publication, and the other to the prisoner's employer who had gone to see him because of a friendly interest. Neither of these persons said a word to induce the prisoner to confess, and no reference was made to his previous confession, if they knew of it. The sheriff was present when the first two confessions were made, but not at the third. On neither occasion did he speak to the prisoner, nor did the prisoner speak to him. *Held*, that as the last two confessions were entirely voluntary and had no connection in thought with the first confessions, they were properly admitted in evidence.

*Criminal law—Murder—Degree—Function of jury.*

In a murder trial where the court reads to the jury that part of the 14th section of the act of March 31, 1860, which makes a killing in perpetration of robbery, murder of the first degree, but omits that part of the section, which makes it the duty of the jury to ascertain the degree, and subsequently, after having returned a general verdict, the jury are sent back to fix the degree, and are distinctly told that they must state in their verdict the degree of which they find the prisoner guilty, and this instruction is without any mandatory direction as to what degree they shall find, a verdict of murder in the first degree will be sustained.

In a murder trial an imperative instruction which takes from the jury their right to ascertain the degree is erroneous, but one which points out to them their duty under the law, but leaves them free to act is nor erroneous.

*Criminal law—Murder—Charge of the court—Degree.*

Where the evidence shows unmistakably that there should be a conviction of the higher degree of murder, or of murder instead of manslaughter, the omission of the court to give instruction as to the lower grade when not requested to do so, is not error, if the jury had been left free to fix the grade of the crime.

Argued May 7, 1900. Appeal, No. 56, Oct. T., 1900, by

defendant, from judgment of O. & T. Somerset Co., Dec. T., 1899, No. 8, on verdict of guilty of murder in the first degree, in case of Commonwealth v. Milton Sheets. Before GREEN, C. J. MCCOLLUM, DEAN, FELL, BROWN and MESTREZAT, JJ. Affirmed.

Indictment for murder. Before LONGENECKER, P. J.

At the trial the undisputed testimony showed that Augustus Glessner was at Berlin on the evening of the 21st of last October, on the way to his home. He was a stone mason and had been occupied during the week working at his trade at or near Meyersdale. On his homeward trip he stopped at Garrett, where he was paid $37.80 for work which he had previously done. During the evening at Berlin he became more or less intoxicated and did not leave until about 11:30 o'clock. Before starting he went into Mr. Dively's restaurant, where he ate oysters and made a few small purchases, and in paying for them displayed the money he had, which the commonwealth contended was then seen by the defendant and Harry Weller, who together resolved to follow him when he left the town and rob him. Glessner went on foot out of the town to the eastward, over the road leading in the direction of his home. The following morning, between 6 and 7 o'clock he was found lying by the roadside, about one and a half miles out of Berlin, in an unconscious condition, with marks of violence upon his person and the unmistakable evidence of foul play. The money he had during the previous night was gone, except a dime which was found near the spot where he lay, in the public road. His hat and a picket, which he is supposed to have used as a walking stick, also lay near by. He was removed to the house of a relative a short distance away and Dr. Shaw was at once called, but he never rallied again and died during the early part of the afternoon. An autopsy, conducted by Dr. Shaw, disclosed the fact that the deceased had been struck several severe blows on the head, one of which produced a blood clot upon the brain which the doctor testified caused death.

District Attorney Meyers: " We propose to prove by the witness on the stand that a voluntary confession was made by the defendant, Milton Sheets, to him of his participation in this crime, the day after he was arrested."

At this point, at their request, the court permitted the defendant's counsel to offer to prove that on the evening preceding the interview with witness Lambert, one Eagan, a detective from Pittsburg, had procured a confession from defendant in the same jail, by improperly making promises and holding out inducements to obtain admissions; that the confession to Eagan, made but the evening before the interview with Lambert, was procured by undue means.

Robert S. Scull called, testified: "I live in Somerset and am a newspaper man."

"Q. What time of the evening of his arrest did you see Sheets in prison? A. About 9 o'clock. Q. Who were with you to see him? A. The Detective Eagan, and Sheriff Hartzell. Q. Had you known Eagan before that? A. I had been introduced to him. Q. As a detective from where? A. From Pittsburg. Q. Were any others present except you and the detective and the sheriff? A. The defendant was there. Q. Where did you see him? A. I think in the female portion of the jail. Q. State what, if anything, you heard Detective Eagan say to the defendant about making a statement. A. Well, he urged him to tell the truth, and he said, if you do, while I am engaged in hunting up evidence against you, I will do all in my power to save you. Q. Did he state anything as to what would be better or worse for him? A. He told him he knew all about it, and the best thing he could do would be to make a free, frank statement of all that transpired. Previous to that he asked a number of questions. Q. Tell us what the conversation was before Sheets made any statement. A. When we went into the jail Sheets was in bed and the sheriff brought him out and Eagan said, 'Milt, how often did you hit that old man?' And the defendant said that he had not struck him. He then asked him if he had gone to Ream's livery stable and secured a bottle, and he said he had not. He then asked him if he had not followed Glessner out the road, and he said he had not. Q. Did he say anything about Weller? A. Afterwards he did. Q. Before or after he told him what he would do or would be good for him? A. He told him first and Mr. Sheets denied all knowledge of it, then he told him that Weller had told him. He said that he had been engaged to hunt up evidence against him."

Cross-examined by Mr. Meyers: "Q. Did he go ahead and tell the story then?"

Mr. Kooser: We object.

The Court: If that was a voluntary statement your objection comes to nothing.

"A. After the detective had promised him as I say, he made the admissions. Q. What did he say he had done?"

Mr. Kooser: We object to that.

The Court: We are trying to find out whether Mr. Lambert's statement is competent or incompetent by any inducements that were previously held out to the defendant.

"Q. Will you repeat what occurred? A. Eagan repeated his promise several times. I went up to the corridor with the detective and the defendant was brought out and Eagan asked him, 'Milt, how often did you strike that old man?' and he said he had not at all. Then he asked him if he had not gone to Ream's livery stable and procured a bottle, and he said he had not. Then the detective asked him if he had not followed Glessner out the road, and he denied that he had. He asked him if he had not gotten a stick of wood at Swartzendruber's, and he denied that. The detective then said: 'We know all about this; Weller has made a full statement and you might as well tell the truth, and I promise you if you do I will be your friend and do all I can to aid you.'"

"Q. (The Court): Is that all the inducement or promise made by the detective? A. He told him he was in a pretty bad place and the best thing he could do would be to tell the truth."

"Q. (Mr. Kooser): Was there anything said to show the right way for him to save his life or neck, or something like that? A. Well, in effect, he told him the only way in which he could save his neck was to make a free statement."

Sheriff Hartzell affirmed.

"Q. Sheriff, were you in the jail the evening that Sheets was arrested, with Mr. Scull and Detective Eagan? A. Yes, sir. Q. Did you hear the interview with the defendant that has just been detailed by Mr. Scull? A. Yes, sir. Q. What did the detective say to him? A. The detective said if he would tell the truth he would do all he could to help him through. Q. Was anything said about saving his neck? A. I don't remember

that. Q. Were these promises held out to Sheets before he made his statement? A. Yes, sir."

The Court: Having heard the testimony of Mr. Scull and Sheriff Hartzell, who were offered by the defense to show that a previous confession of the defendant had been improperly induced by Detective Eagan, and it not appearing that the statement made to Mr. Lambert was made upon the basis of the first statement, or that any reference to it was made, or the attention of the accused directed to it, or in short, that the statement to Mr. Lambert was based thereon, and the offer being to show that the statement made to Mr. Lambert was a voluntary statement, we overrule the objection and note an exception.

After further interrogation of witness Lambert by defendant's counsel, in which appear the following questions and answers:

" Q. On what day did you go into the prison? A. I think it was on the day after the arrest, on the morning of November 8, . . . . in the forenoon sometime; rather in the morning. Q. Who went with you? A. Sheriff Hartzell and Deputy Sheriff Baker. Q. Was he (Sheets) in the cell and you outside? A. Yes, sir."

Counsel for the defendant made the following further objection: We object to this testimony for the further reasons: First, that this statement was procured in the presence of the sheriff and the deputy sheriff, keepers of the prison. Second, that it was made in the presence of the sheriff who had been present at the time the preceding statement was taken, as proven by Mr. Scull and the sheriff, the evening before.

The Court: The objection is overruled. Exception noted to the defense. [1]

Under this offer the commonwealth proved by witness Lambert a confession by defendant, stating, among other things, that defendant and Harry Weller saw Glessner at a restaurant in Berlin; that Weller came outside the restaurant and said: " Glessner's got money; let's hit him;" that defendant and Weller started out of the town of Berlin about half-past eleven o'clock; that they stopped at Ream's stable, where defendant got a beer bottle; that from there they went out to Swartzendruber's, where defendant picked up a stick of stove wood; that they caught up to Glessner about a mile out of town;

that he (Glessner) was very drunk, and was carrying a fence stake or paling; that defendant walked up behind him and struck him on the head with the piece of wood he had picked up; that Weller was within twenty feet at the time; that the blow stunned Glessner and he went down on one knee; that Weller then came up and held one of Glessner's hands while defendant went through his pockets; the money they got was $4.00; that they ran away; that defendant hit Glessner once and " I am sure I did not kill him, for the blow was not hard enough to kill him." Under the same objection the commonwealth proved substantially the same as detailed above.

A similar confession to Robert Cober was admitted under objection and exception. [2]

Verdict of guilty of murder in the first degree. Defendant appealed.

*Errors assigned* were (1–2) rulings on evidence, quoting the bill of exceptions; (5) in taking from the jury their exclusive right and duty to find a degree of murder.

*F. J. Kooser*, with him *George R. Scull* and *E. O. Kooser*, for appellant.—The court erred in admitting the testimony of witness J. A. Lambert, Sheriff Hartzell and Robert Cober as to alleged confessions made by the defendant, following as they did next morning after a confession obtained in the same jail, under the same surroundings, by a detective named Eagan, who had been working in the case, under promises and inducements, being therefore not voluntary: Com. v. Harman, 4 Pa. 270; Rizzolo v. Com., 126 Pa. 54; Barnes v. State, 36 Texas, 356; State v. Drake, 82 N. C. 592; State v. Brown, 73 Mo. 631.

The charge was inadequate: Rhodes v. Com., 48 Pa. 396; Lane v. Com., 59 Pa. 371.

*Rufus E. Meyers*, district attorney, for appellee.—There should be a great distinction between a confession made to the officer engaged in hunting up evidence against a prisoner, after improper influence used in his presence, and to one made to parties, not officers of the law, engaged in a lawful purpose, without any connection with the previous confession whatever, and without a desire to ensnare and entrap the prisoner: Com.

v. Williams, 29 Pa. 102; Fife v. Com., 29 Pa. 429; Rex v. Thomas, 7 C. & P. 345; Com. v. Volkavitch, 5 Kulp, 75; Com. v. Dillon, 4 Dallas, 116; Daniels v. State, 6 Amer. St. Rep. 238; Laros v. Com., 84 Pa. 200; People v. McMahon, 15 N. Y. 384; Com. v. Shaffer, 178 Pa. 414; Underhill's Criminal Evidence (ed. of 1898), 162; Com. v. Johnson, 162 Pa. 63.

The jury was instructed as to the different degrees of murder and left entirely free to name the degree, and where that is done, we contend, this court has frequently held there is no error: Rhodes v. Com., 48 Pa. 396; Lane v. Com., 59 Pa. 371; Shaffner v. Com., 72 Pa. 60; Com. v. Zappe, 153 Pa. 501; McCabe v. Com., 8 Atl. Repr. 45; Cathcart v. Com., 37 Pa. 108; Com. v. Twitchell, 1 Brewster, 551; Com. v. Kilpatrick, 31 Pa. 198; Com. v. Landis, 8 Phila. 453; Johnston v. Com., 85 Pa. 54; McClain v. Com., 110 Pa. 263; Clark v. Com., 123 Pa. 555; McMeen v. Com., 114 Pa. 305; Com. v. Crossmire, 156 Pa. 304; Brown v. Com., 76 Pa. 319; Com. v. Nevling, 98 Pa. 322; Com. v. Hollinger, 190 Pa. 155; Com. v. Harman, 4 Pa. 269.

OPINION BY MR. JUSTCE FELL, July 11, 1900:

Generally where a confession of guilt has been obtained from a prisoner by undue means it will be inferred that a confession of the same or like facts afterward made by him was induced by the same influences; and evidence of a second confession will not be received unless from the length of time intervening, or from proper warning of the consequences of confession or from other circumstances it appears that the influence which led to the first confession has been entirely removed: Wharton's Crim. Ev. sec. 667; 1 Greenleaf on Ev. sec. 221. But no general rule can define the facts which in all cases should be deemed to have influenced the mind of the prisoner, as matters which would readily affect the mind of one person would have no influence upon that of another. The age, character and situation of the prisoner, and all the circumstances under which the confession was made, are to be taken into consideration, and the question whether the original influence continues to operate must be left largely to the discretion of the trial judge, who hears the testimony, sees the witness and observes the conduct of the prisoner.

In this case the first confession was made after the prisoner's arrest, to a detective, who asked him to make a full statement and promised that if he would do so he would befriend him. Evidence of this confession was not offered. The confessions of which evidence was admitted were made the next day; one to the editor of a newspaper, who knew the prisoner and told him that he had called to get any statement which he might care to make for publication; the other to the employer of the prisoner, who had gone to see him because of a friendly interest. Neither of these persons said a word to induce the prisoner to confess, and no reference was made to his previous confession if they knew of it. The sheriff was present when the first two confessions were made, but not at the third. On neither occasion did he speak to the prisoner, nor did the prisoner speak to him. He acted as a jailor merely in admitting the parties. These confessions were entirely voluntary, and had no connection in thought with the first confession, and we see no reason to believe that they were made under the influence of a hope of personal aid which had been excited by the detective. The evidence was therefore properly admitted.

The second question raised by the assignments is whether the instructions as to the power and duty of the jury to ascertain the degree of the crime were incorrect or inadequate. The undisputed evidence was that the killing had been committed in the perpetration of robbery. The defense was insanity. In the course of the charge the learned judge read to the jury that part of section 14 of the act of March 31, 1860, which makes such a crime murder of the first degree, but omitted to read that part of the section which makes it the duty of the jury to ascertain the degree. The part read is as follows: "All murder which shall be perpetrated by means of poison or lying in wait, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration of, or attempt to perpetrate, any arson, rape, robbery or burglary shall be deemed murder of the first degree, and all other kinds of murder shall be deemed murder of the second degree." The part omitted is: "And the jury before whom any person indicted for murder shall be tried, shall if they find such person guilty thereof, ascertain in their verdict whether it be murder of the first or second degree." In the

charge it was said : " The commonwealth contends that Gless-
ner's death resulted from a beating at the hands of the defend-
ant to rob him of his money.　If that fact is established by the
evidence in this case beyond a reasonable doubt, and it is found
that the defendant was at the time responsible for his acts, he
should be convicted in the first degree ; because in such case
the law makes no provision for a verdict of a lower grade."

This instruction was in substance repeated several times and
the jury were not at any time distinctly told that they had the
power to ascertain the degree, and the court was not asked so
to instruct them.　No question as to the degree of the crime
was raised at the trial.　The jury returned a verdict of " Guilty
in manner and form in which he stands indicted."　They were
sent back with this instruction : " Gentlemen, we will ask you to
retire and specify the degree in your verdict.　It is a general
verdict ; you must state the degree.　A verdict of ' Guilty in
manner and form in which he stands indicted ' could not be
received, so you will retire to your room again and state the
degree.　The indictment is for murder generally, but the jury
must state the degree in which you find the defendant guilty."
They then returned a verdict of " Guilty of murder of the first
degree."

While the statute defines the degree, it is made the exclusive
duty of the jury by their verdict to ascertain it, and it is the
right of the prisoner to have it ascertained by them.　In Rhodes
v. Com., 48 Pa. 396, it was held to be error to instruct the jury
that if they found the prisoner guilty they must state in their
verdict that he was guilty of murder of the first degree.　But
it was said in the opinion that it would not have been error
to have instructed them that the crime proved was murder of
the first degree ; the error was in compelling them so to find.
This ruling was affirmed and followed in Lane v. Com., 59 Pa.
371, but it was said by THOMPSON, C. J. " . . . . nor are we to
be understood as finding fault with the practice which is en-
tirely proper of judges freely advising jurors as to the duty of as-
certaining that degree of murder toward which the facts seem
to point, always leaving them however free to deliberate upon,
and the duty and responsibility of finding the degree, if they
convict."

In Shaffner v. Com., 72 Pa. 60, the instruction assigned for

error was : " If the prisoner is guilty there can be no difficulty in ascertaining the degree, for being by poison it must be in the first degree, if purposely administered ;—if you are convinced he is guilty of the crime, it is murder of the first degree as fixed by the act of assembly, and it is your duty so to say without regard to the consequences to the prisoner." This was said to approach the boundary line of peremptoriness, but not to be error. In McMeen v. Com., 114 Pa. 300, the jury were instructed : " If the defendant murdered his wife by means of poison it would be murder in the first degree, and the jury needs neither definition nor instruction in regard to any other kind of homicide. If you find the defendant sent the poison to his wife with the intent to take her life, then the law says that is murder in the first degree, and you should say so in your verdict. If you fail to find such guilty intent then acquit the defendant." This was held to be a correct instruction. In these cases and many others the distinction is drawn between a proper statement of the law and a binding instruction to the jury which takes from them the ascertainment of the degree. An imperative instruction which takes from the jury their right to ascertain the degree is erroneous, but one which points out to them their duty under the law, but leaves them free to act, is not erroneous.

There was then no error in the instruction given, and we need only consider whether the charge was inadequate in not informing the jury of their power in fixing the degree. That part of the 74th section of the act of 1860, which defines murder of the second degree was read to the jury ; and after having returned a general verdict they were sent back to fix the degree, and distinctly told that they must state in their verdict the degree of which they found the prisoner guilty. If the whole of the section had been read it is conceded that no further instruction would have been required, and the only ground of the exception is that it was not all read. The jury were told all that the omitted part of the section contains, and they would have known no more of their power in the matter if it had all been read. They were informed by the part read that there were two degrees of murder, and after returning a general verdict of guilty they were instructed to state in their verdict the degree of which they found the prisoner guilty. In this instruction

no mandatory direction having been given, their power to fix the degree was necessarily implied.

The real ground of defense was the insanity of the prisoner and under the undisputed evidence the verdict should have been either guilty of the first degree or not guilty on the ground of insanity. The case was so treated at the trial. There was no suggestion in the points for charge that there could be a verdict of the second degree. If more specific instructions were desired they should have been asked for. Where the evidence shows unmistakably that there should be a conviction of the higher degree of murder, or of murder instead of manslaughter, the omission of the court to give instructions as to the lower grade when not requested to do so, has been held not to be error, if the jury have been left free to fix the grade of the crime: Brown v. Com., 76 Pa. 319; Nevling v. Com., 98 Pa. 322; Clark v. Com., 123 Pa. 555; Com. v. Crossmire, 156 Pa. 304; Com. v. Hollinger, 190 Pa. 155.

The judgment is affirmed, and it is ordered that the record be remitted to the court of oyer and terminer of Somerset county in order that the sentence may be carried into execution according to law.