STATE of North Dakota, Plaintiff and Respondent,

v.

Oscar WHITEMAN, Jr., Defendant and Appellant.

Cr. 258.

Supreme Court of North Dakota.

Dec. 18, 1954.

W. C. Lynch, Associate of Strutz, Jansonius & Fleck, Bismarck, N. D., for defendant and appellant.

Paul Benson, Atty. Gen., J. K. Murray, Sp. Asst. State's Atty., Bismarck, and H. L. Malloy, State's Atty., Dunn County, Halliday, N. D., for plaintiff and respondent.

JOHNSON, Judge.

On January 17, 1953, at ten o'clock a. m., the defendant, Oscar Whiteman, Jr., entered a plea of guilty to murder in the first degree before the district court of Dunn County, North Dakota. After the entry of this plea, the court questioned the defendant concerning the facts and circumstances involved in the crime charged against him of murder in the first degree of Cynthia Starr. Upon the conclusion of the questioning of the defendant, he was sentenced for the crime of murder in the second degree and ordered to serve thirty years in the state penitentiary at Bismarck, North Dakota.

On March 10, 1954, this defendant filed a motion to set aside the judgment of conviction rendered against him, to allow him to plead anew, enter a plea of not guilty, and to defend the action. The motion came on for hearing on March 19, 1954, before the Honorable Harvey J. Miller, District Judge, Dunn County, North Dakota, who had imposed sentence on the defendant January 17, 1953.

After consideration of the motion and the evidence introduced in support thereof and consideration of briefs, on March 31, 1954, the court entered an order denying the motion. The instant appeal is from the denial of the motion. The grounds upon which the defendant asks relief are:

"1. That the judgment of conviction in the above captioned action was obtained by

reason of fraud and coercion, deceit, duress and other actions prejudicial to and overriding and destroying the free will of said defendant, and was perpetrated upon said defendant by the law enforcement officials of Dunn County, North Dakota, by mob violence, and other individuals; that therefore such judgment and decree was and is absolutely void.

"2. That new evidence has been discovered which is material to the defendant, and which the defendant could not, with reasonable diligence, have discovered and produced at the trial.

"3. That the defendant, Oscar Whiteman, Jr., was not furnished legal counsel, as guaranteed by the constitution of the United States, and the constitution of the State of North Dakota, and that therefore the imprisonment of the defendant is illegal and void."

A similar motion had been heard before the same court in the case of North Dakota against Donald Malnourie, defendant, on May 27 and 28, 1953.

It was stipulated at the hearing on the motion in the case at bar:

"That all of the evidence and testimony introduced and received at the said hearing on the motion of Donald Malnourie and as submitted as a part of said motion, shall be considered as having been introduced and shall be received without objection at the said hearing on the motion of Oscar Whiteman, Jr., on March 19, 1954, and that the said testimony of witnesses given at the Malnourie hearing would be the same if called upon to testify in the instant hearing on the motion of Oscar Whiteman, Jr.

"That the following documents shall be received without objection of counsel for the State of North Dakota on the motion of Oscar Whiteman, Jr., defendant in the above captioned action:

"1. Affidavit of Oscar Whiteman, Jr.;

"2. Affidavit of Charlotte Logan;

"3. Certified copy of Pathological Report of the examination by Dr. Kling;

"4. Certified copy of Autopsy Report of A. R. Gilsdorf, M.D.;

"5. Signed statement of Samuel Meyers, duly witnessed;

such certified copies of pathological report and autopsy report having each been certified to by M. A. Olson, Dunn County Coroner."

On the basis of the above stipulation, all of the proceedings and evidence in the case of State of North Dakota against Donald Malnourie is considered in connection with the motion of the defendant in this case.

There are primarily two contentions to be considered in this case:

1. Whether the judgment of conviction was obtained by fraud, coercion, deceit, duress, or other actions prejudicial to and overriding and destroying the free will of the defendant perpetrated by the law enforcement officials of Dunn County by mob violence and by other individuals, thereby rendering the judgment of conviction void.

2. Whether the defendant, Oscar Whiteman, Jr., was denied counsel as guaranteed by the constitution of the United States and the State of North Dakota, and that therefore his conviction is illegal and void.

This last consideration involves examination of the entire record to determine whether the defendant freely and understandingly waived counsel.

The procedure on this motion is not challenged. It is similar to the procedure that was used and approved in State v. Magrum, 76 N.D. 527, 38 N.W.2d 358.

In order to dispose of the first contention of the defendant, it is necessary to examine in detail the basic facts in the treatment of the defendant which resulted in an alleged confession by him dated January 10, 1953.

This defendant was arrested on January 7, 1953, and brought to Halliday, North Dakota, where he, together with Donald Malnourie, was subjected to extensive questioning. Late in the afternoon of January 9, 1953, this defendant and Donald Malnourie were taken by the sheriff and other law enforcement officers of Dunn County to a place known as the "Big Flat Schoolhouse". The State's Attorney of Dunn County had no part in the questioning of this defendant at Halliday, nor was he present or involved in the incident that took place at the Big Flat Schoolhouse.

The questioning of Malnourie and this defendant had been conducted by three or four men. One of the participants was highway patrolman, Lynn Amsden, who assisted the officers of Dunn County in the investigation of the death of Cynthia Starr and the location of her body. The officers of Dunn County principally involved in the investigation were Jack Pavlenko, sheriff, Dunn County, Leo Lesmeister, his deputy, Ben Kills Thunder, chief of police on the Berthold Indian Reservation, and M. A. Olson, Dunn County Coroner. They were all present at the incident at the Big Flat Schoolhouse. It is apparent from the testimony that little, if any, progress had been made to procure any information from either Malnourie or Whiteman concerning the death of Cynthia Starr up to and including the late afternoon of January 9, 1953.

Although the evidence is not clear as to how much information had been obtained by the officers of Dunn County from Whiteman by the afternoon of January 9th, there must have been some indication during the questioning that the body of Cynthia Starr might be located near the Big Flat Schoolhouse.

In an effort to attempt to locate her body, these two men had been taken eight or ten miles south of Halliday to a foundation designated as "Big Flat Schoolhouse." Mr. Amsden testified that he estimated that the crowd present there, somewhere between four and five o'clock on the afternoon of that day, numbered from ten to thirty people. There were quite a number of cars at the scene. Just as Mr. Amsden parked, "there was quite a fuss broke out". At a distance of some seventy-five to one hundred feet he saw the sheriff, Jack Pavlenko, strike Malnourie. He also saw that Mr. Olson, the coroner, held Malnourie by the shoulders, was shaking him, pulling him, and hollering at him. He saw the sheriff strike Malnourie twice. A wrecker was out at the scene which belonged to a garage at Halliday. A chain was produced. The wrecker was equipped with a winch cable. The winch cable was tied to one arm of the defendant, Oscar Whiteman, Jr., who goes by the nickname of "Tony". His other arm was tied with the chain to a post. In connection with the chain incident, the testimony of Mr. Amsden at one point indicates that there may have been some movement to procure the tightening of the winch cable after Whiteman's arms had been tied to it. Statements were made to Whiteman to tell where the body of Cynthia Starr was located or they would tighten the cable. As Mr. Amsden put it, he, referring to Whiteman, "was told that he had better talk or he would be torn apart." Apparently Mr. Amsden thought that this was going too far and he claims that he told the fellows that they better stop, "these two boys were going to the penitentiary anyway and there was no use of some of them going with." He also stated that in addition to striking Malnourie twice, the sheriff, in an effort to hit him, missed once; that he saw Malnourie fall down once. After Mr. Amsden interceded in connection with this incident, the sheriff and his party took Malnourie and Whiteman back to Halliday to the city hall where they were both extensively questioned. The questioning was in the presence of the same officers and the others who had exhibited hatred and hostility towards the prisoners at the incident on January 9 at the Big Flat Schoolhouse.

After the incident mentioned, and during the subsequent questioning at the city hall, Mr. Amsden is fairly certain that Oscar Whiteman, Jr., late that evening told the crowd there that there was more to the killing of Cynthia Starr. From this it may be

inferred, although the evidence does not definitely disclose what was said by this defendant, that he had told something that would indicate that the body of Cynthia Starr was located someplace in the vicinity of the Big Flat Schoolhouse. The information obtained in that connection must have been the basis for the trip to the Big Flat Schoolhouse on the afternoon of January 9, 1953.

The evidence discloses that the questioning after the incident referred to was extensive, went beyond the limits of reasonable persuasion in an atmosphere that was "hostile" and showed "hatred" toward both Malnourie and Oscar Whiteman, Jr. Remarks of such hostility and hatred were made, such as "Give him to the Indians (referring to Malnourie); they will make him talk," or "Burn him at the stake," or "Make him talk". Mr. Amsden even admits, "but I could even be guilty of making a statement as to what should be done to him", referring to Malnourie. All of this testimony comes from a law enforcement officer connected with the investigation of the death of Cynthia Starr and the location of her body. It would only be reasonable and human for an officer involved in an incident of this character to give a version thereof which would be as mild as possible without being untruthful in its essential details. Mr. Amsden not only testifies to the acts of violence committed at the time of the incident, but also in Exhibit D in this case, testified to promises made by the sheriff of Dunn County to the defendant, Oscar Whiteman, Jr.

The description of the acts that took place at the scene of the Big Flat Schoolhouse incident is corroborated by Samuel Meyers, a tribal business counsel for the Berthold Reservation. He recalls the incident of the day as having taken place at about five o'clock in the afternoon. He was attempting to locate the searching party who were looking for the body of Cynthia Starr. When he came upon the scene, he saw both Donald Malnourie and Oscar Whiteman, Jr., there. He saw a bunch of men and two Indians, Malnourie and Whiteman. He also saw Mr. Amsden

there. He had some ladies in his car and Mr. Amsden told him, "You better move these ladies out of here." When he first drove up and got out of his car, he saw that they were striking one of the suspects, either Malnourie or Whiteman. Later he testified that he saw both knocked to the ground. He says that Malnourie was knocked to the ground three times. He was hit on the face. He also saw the wrecker truck and described the use of the chain as follows:

"Q. Would you tell the court what part that wrecker truck played in the events that followed? A. Well, after the two didn't tell where the body was, one man of the group said, 'All right, get the chain.' And one of the men got the chain out of the pickup and tied that chain around the post, fence post, that is.

"Q. And what did they do with the other end of the chain? A. And tied it around the body of Oscar Whiteman, Jr.

"Q. Was it around his body or around his arm, do you know? A. Around the arm.

"Q. Did they do anything with the other arm? A. Yes, sir. They backed the wrecker up and took the hoist and tied the other end of the arm to the hoist.

"Q. Did you hear anything said by any person while that was being done and such statement being directed to Oscar Whiteman, Jr.? A. Yes; they were going to stretch him."

The testimony then shows that the threat to stretch him was made because he did not tell where the body was located.

After the conclusion of the incident and before the departure of the sheriff and suspects and other members of the group for the return to Halliday, Mr. Meyers was given permission to talk to both Malnourie and Whiteman. He took Malnourie aside and asked him "if he wouldn't tell the truth, what he knew". Malnourie replied, "I

don't remember." Then he talked to Whiteman and he said that he had "told everything that he knew."

During the time that the witness was at the scene, he found it necessary to go back to his car and when he returned close to where the group of men were located he saw both Malnourie and Whiteman struck, although he says that Malnourie was struck "most", probably three or four times. He described the effect that this had on Malnourie and says that Malnourie begged not to be hit any more and said, "Don't hit me any more."

The attitude of the crowd towards the prisoners at the Big Flat Schoolhouse was termed, "Well, I'd say hatred."

There is further corroboration of the treatment of the prisoners at the Big Flat Schoolhouse from Mrs. Cecelia Mason. She saw Whiteman lying on the ground and says, "They had struck him down." She sat in her car listening and looking and heard, "them guys cussing them down and, and then every time they were going to strike them boys, well, I didn't want to look." She heard Malnourie say, "Please, please, Leo, don't. Don't hit me anymore." She saw Leo (Lesmeister) strike Malnourie. She saw the sheriff there. The treatment of the two prisoners, whom she describes as "boys", was such that she could not bear to watch it all. She saw the wrecker pull back and she heard the chains and she told another lady who was with her, "Look what they're going to do. I think they're going to string them." She couldn't stand it any more, so she turned away.

Mrs. Mason followed the cars back to Halliday. She went to the city hall and found the sheriff standing at the door. She tried to enter and he said, "No, no women and children allowed."

The sheriff of Dunn County, Jack Pavlenko, admits slapping Malnourie two or three times at the scene of the incident near the Big Flat Schoolhouse. He claims he was insulted by Malnourie. He also admits that there was a chain incident, but says that happened when his back was turned and that when he became aware of it, he stopped the procedure and had the prisoners taken to the car immediately. At the same time he insists that the prisoners were not mistreated. But when a police officer admits slapping a prisoner under his control and is involved in a scene approximating mob violence, he can hardly expect that much credence will be given to his testimony when he protests vigorously that there was no mistreatment involved; that he advised the prisoners of their constitutional rights to have counsel at all stages of the proceedings, and relates other facts indicating that no pressure was exerted on the prisoners.

In defendant's Exhibit D, Lynn Amsden, the highway patrolman, states that he remembers that at different times Whiteman was promised "that everything they could do for him would be done if he would tell where the body was." This promise was made by the sheriff.

Yet the sheriff, in conflict with Mr. Amsden's version, testified that he had made no promises of any kind. He testified that he did not knock Malnourie down to the ground, that he lost his balance and fell. He admits that at the time of the arraignment in district court of Malnourie and Whiteman, he did not tell the court that he had slapped Malnourie and says, "He never asked me and I never told him anything." He also admits that he did not tell the court about the chain incident for the same reason.

The record positively discloses that the trial court at the time of the arraignment had no information as to the treatment of Malnourie and Whiteman on the evening of January 9, 1953, at the Big Flat Schoolhouse. Of course the trial court did not ask the sheriff about this incident, as it was not aware of the fact that such an incident had taken place.

The sheriff now attempts to take credit for stopping the chain incident. But his actions speak louder than his words.

Apparently Malnourie and Whiteman had been taken out to the Big Flat Schoolhouse for the purpose of locating the body of Cynthia Starr. When it was not found at this point, coercion and actions approaching mob violence took place in the presence of the sheriff, his deputy, the county coroner, and other law enforcement officers who had the suspects in charge. The acts that took place at the Big Flat Schoolhouse are a reversion to medieval methods condemned ages ago. Their effect on the suspects is impossible to measure.

The sheriff and all of the law enforcement officers involved were in duty bound to be alert and to see to it that only proper methods of persuasion were involved. Striking the two prisoners as the testimony positively shows, tying one of them to a post and threatening to tear him apart, are methods of persuasion which cast doubt upon any confession obtained thereafter from these men.

Immediately after the activities almost amounting to mob violence, threats, and coercion to which the prisoners had been subjected, they were questioned extensively again at the city hall on the same evening. It is to be noted that the first written confession obtained from the defendant, Whiteman, was on January 10, 1953, when the hatred, violence, and threats of torture exhibited against him were fresh in his mind. In the case of People v. Dye, 119 Cal.App. 262, 6 P.2d 313, at page 316, the court holds that unless it clearly appears that the threats and inducements had ceased to operate upon the mind of the accused to bring about his statements of guilt, it may not be used against him. This case further held that the burden is upon the prosecution to prove the voluntary character of a confession. The pertinent question presented here is this: Can a confession obtained upon the background and the events that transpired on the late evening of January 9, 1953, at the Big Flat Schoolhouse and the subsequent questioning of this defendant and Malnourie be accepted as a confession freely and voluntarily given? We do not believe so.

The defendant asserts that any statements or confessions or pleas made by him were made solely by reason of threats, coercion and fear of physical mistreatment. On January 14, 1953, he, together with Malnourie, signed a formal document called a confession, which, however, is in the exact language of the first degree murder charge filed against him and Malnourie, except for a recitation that it was voluntarily given. Once having signed a confession, which we do not believe was freely and voluntarily given, the prisoner still being under the control and influence of the police officers who had allowed him to be subjected to threats and physical violence, and one of whom had made promises to him, it becomes a question of fact whether he was not still dominated at the time by the same influences that resulted in the confession of January 10, 1953. No satisfactory evidence appears to the contrary. The same would be true of the oral plea given in district court. They could well be calculated to have been the result of the same influences that brought about the involuntary confession of January 10, 1953, and until satisfactory evidence appears to the contrary, they are presumed to have been induced by the same influences as the original involuntary confession.

It is fundamental and a well established rule that a confession of guilt by an accused is admissible against him when, and only when, it is freely and voluntarily made without having been induced by expectation of any promised benefit, or by the fear of any threatened injury, or the exertion of any improper influence. 22 C.J.S. Criminal Law, § 817 b, page 1425; State v. Gibson, 69 N.D. 70, 83, 284 N.W. 209, 215; State v. Kerns, 50 N.D. 927, 935, 198 N.W. 698, 700; State v. Nagel, 75 N.D. 495, 515, 516, 28 N.W.2d 665, 667; State v. Braathen, 77 N.D. 309, 323, 43 N.W.2d 202, 211.

In the case of People v. Dye, supra, 6 P.2d at page 316, the court, dealing with a confession obtained a few days after the defendant had been subjected to promises, direct threats short of violence and which

was admitted at the time of his trial for murder as evidence of his guilt, said:

"The burden is upon the prosecution to prove the voluntary character of a confession. 'It is a fundamental rule of criminal law that a confession may not be used against a defendant, unless the prosecution can show its free and voluntary character, that it was made without previous inducement, and that neither duress nor intimidation caused defendant to furnish such evidence against himself. People v. Miller, 135 Cal. 69, 67 P. 12. It is also true that if threats and inducements are made to a prisoner, and within a few days thereafter he makes a confession, such acknowledgment of the commission of the crime may not be introduced in evidence, unless it clearly appears that the threats and inducements had ceased to operate upon his mind to bring about his statement of his own guilt. People v. Johnson, 41 Cal. [452], 455.' People v. Loper, 159 Cal. 6, at page 14, 112 P. 720, 723, Ann.Cas. 1912B, 1193. See, also, People v. Russell, 77 Cal.App. 113, 118, 246 P. 110; People v. Quan Gim Gow, 23 Cal.App. 507, 138 P. 918. To 'threats and inducements' we think it appropriate to add, any illegal process whereby through external means of pressure the free will of the defendant has been overcome."

It is the duty of sheriffs, their deputies, and other police officers who represent the people, which includes defendant, under their oath to safeguard the constitutional rights of an accused the same as those of any other citizen. Such officers should zealously and sedulously refrain from attempting to obtain a confession from a defendant by unlawful means. *The end never justifies the use of unlawful means.* Since our law surrounds every accused with certain legal rights, it is necessary for law enforcement officers to be mindful thereof and keep all of their activities in investigation of crime and the enforcement of law within the spirit and measure thereof. The prescribed duties of law enforcement officers impose not only the procurement of good law enforcement, but the effective safeguarding of the legal rights of an accused.

■ "Where an original confession is involuntary or secured by improper means, subsequent confessions of the same crime, though made to persons other than those to whom the original was made, are inadmissible as evidence, unless it appears that from lapse of time, or otherwise, the influence which induced the original confession had been removed and the party confessing was no longer dominated by such influence. People v. Spranger, 314 Ill. 602, 145 N.E. 706. *If the first confession was coerced by intimidation, fear, or other improper influence, the presumption would arise, in the absence of proof to the contrary, that a second confession was the product of the same influence.* State v. Ellis, 294 Mo. 269, 242 S.W. 952, 24 A.L.R. 682; 16 Corpus Juris, 722; State v. Jones, 54 Mo. 478; State v. Brown, 73 Mo. 631; Lang v. State, 178 Wis. 114, 189 N.W. 558, 24 A.L.R. 690; Dinah v. State, 39 Ala. 359; Flamme v. State, 171 Wis. 501, 177 N.W. 596; White v. State, 129 Miss. 182, 91 So. 903, 24 A.L.R. 699; 1 Greenleaf on Evidence, par. 221; Commonwealth v. Sheets, 197 Pa. 69, 46 A. 753; State v. Wood, 122 La. 1014, 48 So. 438, 20 L.R.A.,N.S., 392; 1 R.C.L. 573. In this case the evidence failed to show that the influences which confessedly rendered the first confession inadmissible as evidence had been removed, and the admission in evidence of plaintiff in error's subsequent confessions was therefore, in the condition of the present record, error." People v. Sweetin, 325 Ill. 245, 156 N.E. 354, 356. (Emphasis supplied.)

■ In this case the formal confession of January 14, 1953, and the oral confession by plea of guilty upon arraignment in the district court are presumptively the products of the same influence that brought about the original confession of January 10, 1953. No credible evidence appears to the con-

trary. The defendant was still in the custody of the same officials who participated in the Big Flat Schoolhouse affair.

In the case of Simmons v. State, 107 Tex. Cr.R. 504, 296 S.W. 513, at page 515, it is stated:

"Appellant himself makes no claim that any coercion was used at the time the confession was actually given, but asserts that certain officers had abused, cursed, assaulted, and threatened him on the night before and had told him if he did not make the confession they would kill him. If his testimony should be taken as true it would have demanded the exclusion of the confession and showed most brutal conduct on the part of the officers."

In the case at bar the confession was obtained the next day after threats and violence had been imposed upon the defendant. The proof as to that is positive and although there may not have been any coercion exercised at the time of the actual signing of the confession, in view of what transpired late on the evening of January 9, 1953, we believe the confession was involuntary and was procured under circumstances which would be likely to produce an untrue statement. The inadmissibility of a confession, unless voluntary, is to exclude false evidence. Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166; Wigmore, Evidence, 3d ed., Sec. 823 et seq.

We have arrived at the conclusion that the improper treatment of Malnourie and Whiteman on the evening of January 9, 1953, the acts of violence, threats, hostility, and the atmosphere of hatred there exhibited and continuing into the late evening when they were being questioned, continued to operate upon the mind of the defendant to an extent which brought about his confession of guilt on January 10, 1953, and constitute facts overreaching the free will and judgment of the defendant, and have deprived him of a trial on the merits. The judgment of conviction is, therefore, void. The defendant should be allowed to withdraw his plea of guilty and then resume the position occupied by him before he made his plea. State v. Magrum, 76 N.D. 527, 531, 532, 38 N.W.2d 358, 360, and the authorities there cited.

There is another and additional reason why the judgment of conviction must be set aside. That leads us to the consideration of the second main contention of the defendant.

Section 13 of the North Dakota constitution guarantees to one accused of crime the right to appear and defend in person and with counsel. Sections 27–0831, 29–0127, and 29–1303 of the North Dakota Revised Code of 1943 are legislative expressions of the guarantee of one accused of crime to appear in person and with counsel. These legislative declarations set a minimum standard which should be followed in order to afford the defendant his right to counsel as guaranteed. It is important that they be made effective so that every accused may procure a fair trial.

The incidents leading up to an appearance of an accused in district court on arraignment are background against which we must view the proceedings before the court in order to determine whether an accused has been afforded the opportunity to freely exercise the rights contemplated by our constitutional provision and the legislative declarations thereof.

In order to fully comprehend the nature of the background of the plea of murder in the first degree entered by the defendant, Oscar Whitement, Jr., it is necessary to examine not only his testimony before the court, but also that of Donald Malnourie. Before Donald Malnourie had entered a plea of guilty to murder in the first degree, he was questioned at considerable length by the court in the presence of defendant Whiteman. The court asked him whether he had a lawyer and he replied that he did not. He was asked whether he would like to have one, and he replied, "Yes, sir." Then the court asked him:

"Have you the means to hire one? A. No, I haven't.

"Q. Do you have any property of any kind? A. Yes, I have."

The defendant, Malnourie, related that he had a quarter and eighty acres of land free from mortgages, but explained that he was an Indian and when asked as to the title to the land, "Well, it's—you know—."

"Q. What? A. You see I am an Indian. I don't know if I got—it's my land, but—"

Then he was asked if he had attempted to hire a lawyer, and whether he wished to hire one, and he answered "Yes". Up to that point it is clear that Malnourie wanted to consult a lawyer. Then there was further questioning, but the purport and clear implication of the statements made by Malnourie is to the effect that he waived his right to counsel only because he felt that he could not hire a lawyer, that he did not have the money to hire a lawyer, and that he did not have access or resort to his property. All this transpired in the presence and hearing of Oscar Whiteman, Jr.

Whiteman was examined by the court and stated that he was twenty-five years of age and expressed his desire to have a lawyer. He was asked:

"And your decision not to have a lawyer, is that because you are unable to hire one or just don't care to have one? A. Well, I ain't got the money to hire a lawyer.

"Q. That is why you do not wish to have one? A. Yes, sir."

From this it clearly appears that Whiteman did not want to have a lawyer because he felt he could not hire one.

Then the court went on and questioned him as to his property and he related that he owned one hundred sixty acres of land; that the land was worth about $1,000; that he had not tried to employ a lawyer, and when asked again by the court whether he wished to have time to hire a lawyer, he replied:

"No, I don't think I will have time to get a lawyer.

"Q. You don't care to have time? A. I don't care to have a lawyer."

The record and testimony indicate that Whiteman was under the impression that he did not have time to get a lawyer; that since he was also possessed of property the court would not appoint him a lawyer. The clear implication of the proceedings indicates that he waived his right to a lawyer because of these circumstances.

The court examined Malnourie with reference to the worth of his land and asked:

"And you do desire to have time to hire a lawyer, do you? The court will give you time if you wish to have it. A. You see I have no money, though, to get a lawyer.

"Q. You have property. A. Well, you see, I can't sell that. It's under trust from the government.

"Q. You said you were a citizen. A. Well, yes, I am. I am an Indian citizen.

"Q. Yes. For that purpose you could mortgage it, couldn't you? A. Well, yes, I suppose I could."

Whiteman was also present when this took place.

The court then ordered the State's Attorney to read the joint information against Donald Malnourie and Oscar Whiteman, Jr. It reads, omitting its formal parts, as follows:

"* * * informs this court, that heretofore, to wit: On or about the the first day of January in the year of our Lord one thousand nine hundred and fifty-three in the County of Dunn in the State of North Dakota, one Donald Malnourie and Oscar Whiteman, Jr., late of the County of Dunn and state aforesaid, did com-

mit the crime of murder in the first degree, committed in the manner following, to wit: That at the same time and place the said defendants did then and there willfully and unlawfully and feloniously, of their own malice aforethought, and with the premeditated design to commit rape upon the body and person of Cynthia Starr, a minor girl of the age of sixteen years, between the hours of 6:30 o'clock p. m. and 8:30 o'clock p. m. in the nighttime, on the first day of January, 1953, in the vicinity of Halliday, in Dunn County, North Dakota, being what is known as the Big Flat District, south of Halliday, North Dakota, hit and strike the said Cynthia Starr over the head and body with a wine bottle, generally known as a four-fifths quart bottle, containing wine, while in an automobile described as a 1948 Plymouth four-door sedan, then and there knocking the said Cynthia Starr unconscious and from which said car the said defendants did then and there, or a short time thereafter, drag the said Cynthia Starr from the said car, place her in a ditch, on the north side of the road, just south of the SE¼ of Section 15, Township 143, Range 92 in Dunn County, North Dakota, where she died as a result of such blows on the head as aforesaid, and where she was found dead January 10, 1953, and the said defendants, Donald Malnourie and Oscar Whiteman, Jr., in the manner and by the means aforesaid, did commit the crime of murder in the first degree."

The court then asked the defendants if they understood the information and whether they understood that it charged them with the crime of murder in the first degree, to which each of them replied affirmatively. Then each of them was asked whether they understood the nature of the crime and they replied, "Yes, sir." The court then announced

"You know that if you are found guilty, that you may be punished for such offense?" No explanation of the consequences of a plea of guilty to murder in the first degree was made to either Malnourie or Whiteman. They were not told there were degrees of the crime of murder; that the punishment for first degree murder was life in the penitentiary. For all the record discloses, they may have been totally unaware of the complete consequences of a plea of guilty to murder in the first degree.

Then the court advised further that a plea of not guilty would entitle them to a trial before a jury of twelve citizens of Dunn County before the court, at which time they could appear in person and by counsel if they so desired; that they could compel the attendance of witnesses and that such trial would be at the next term of the Dunn County district court. They were informed that if they entered a plea of guilty the court would impose sentence forthwith. Then this followed:

"The Court: Now, Mr. Malnourie, you have indicated that you desire to have a lawyer?

"Mr. Malnourie: In this court, yes.

"The Court: And it appears that you have property ample to employ a lawyer yourself and the court will set a time for you to appear again later, and give you an opportunity to consult a lawyer.

"Mr. Malnourie: Your Honor, the court wouldn't give me a lawyer, would they?

"The Court: Well, if you were without means the court would provide a lawyer for you, but if you have a quarter and a half of land and it's free from indebtedness, the court wouldn't feel justified in spending public money to hire a lawyer for you.

"Mr. Malnourie: Well, then I'm—I don't want a lawyer, and get it over with.

"The Court: You do not want a lawyer?

"Mr. Malnourie: No.

"The Court: The court is willing to give you the time to see if you might not employ one and if you wouldn't be able to hire one yourself—I am not trying to rush you through this thing. It's an important matter and it's a serious matter.

"Mr. Malnourie: I know, sir; might as well get it over with now.

"The Court: Well, I don't think you should just try to rush through this thing just for the purpose of having it over with. If you wish to consult a lawyer, why, the court is very happy to give you the time to do that.

"Mr. Malnourie: I'll plead guilty, your Honor."

It seems entirely clear that Malnourie waived the right to counsel because he felt that he did not have the time to employ counsel and because the court had told him that it could not under the circumstances furnish him counsel. Whiteman's financial circumstances were much like those of Malnourie, although the record does not show whether his land was held in trust. He had indicated too that he wanted a lawyer. He was also an Indian. He would naturally conclude that since the court could not furnish a lawyer to Malnourie, it would not furnish one to him. When he was asked by the court:

"Mr. Oscar Whiteman, Jr., to the criminal information charging you with the crime of murder in the first degree, what is your plea,—guilty or not guilty?

"Mr. Whiteman: Guilty.

"The Court: Do you understand that in making that plea of guilty, you admit that you committed this crime?

"Mr. Whiteman: Yes, sir.

"The Court: And that you may be punished for it?

"Mr. Whiteman: Yes, sir."

Again it is noted that no mention is made of the consequences of a plea of guilty to murder in the first degree. Malnourie had just pleaded guilty to get it over with.

When the record is completely and fully scrutinized, it indicates that Whiteman waived counsel because he felt that under all circumstances he could not procure the appointment of counsel.

■ The defendant is an Indian citizen, 25 years of age, with only a grade school education. He was confronted by the most serious crime under our law. He had no one with whom to counsel or from whom to seek advice to protect his legal rights. He had been detained in an atmosphere of hostility of which the trial court was not aware. He had been subjected to intimidations, threats and even violence, and the evidence bears out that he felt that there was nothing he could do except to plead guilty to the information charging him with murder in the first degree. He felt that he had but one alternative. It was a waiver compelled by a lack of choice, arising out of the necessities of the circumstances.

A waiver of counsel based on these conditions cannot be said to be freely and understandingly made. There is also the possibility that there was a misunderstanding between the court and the defendant. It cannot be said that the accused, on the basis of what transpired, understandingly waived counsel. State v. Magrum, 76 N.D. 527, 533, 38 N.W.2d 358, 360; Uveges v. Pennsylvania, 335 U.S. 437, 441, 69 S.Ct. 184, 185, 93 L.Ed. 127.

He had signed the confession on January 10, 1953, given under the circumstances already set forth. He signed a formal confession on January 14, 1953. The evidence warrants the inference that he believed that since he was possessed of property, the court would not assign him counsel.

There must not only be the capacity to make an understanding choice, but there must be an absence of subverting factors so that the choice is clearly free and responsible. Here the choice does not appear to be free and responsible. The accused at no time had refused counsel. Rather the testimony indicates the desire for one, but the belief that the desire could not be fulfilled. And here, as was said in the Uveges v. Pennsylvania case, 335 U.S. 437, 69 S.Ct. 184, 186:

> "The gravity of the crime and other factors—such as the age and education of the defendant, the conduct of the court or the prosecuting officials, and the complicated nature of the offense charged and the possible defenses thereto—render criminal proceedings without counsel so apt to result in injustice as to be fundamentally unfair, the latter group (referring to members of the United States Supreme Court) holds that the accused must have legal assistance under the Amendment whether he pleads guilty or elects to stand trial, whether he requests counsel or not. Only a waiver of counsel, understandingly made, justifies trial without counsel."

■ A defendant may competently and intelligently waive his right to the assistance of counsel. Whether there has been such a waiver is to be determined by the facts of each case. The burden of proof is upon the defendant to establish the facts upon which he relies. Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595; State v. Magrum, 76 N.D. 527, 38 N.W.2d 358. Here the facts do not warrant the conclusion that such waiver was made. The defendant and appellant has sustained the burden of proof.

After the entry of the plea of guilty both Malnourie and Whiteman were questioned at considerable length by the court with reference to the facts that gave rise to the information that had been filed against them. It is unnecessary, and perhaps would be inappropriate to discuss the facts in that connection in view of our disposition of this case. Both the court and the State's Attorney apparently were in doubt as to the nature of the crime of which this defendant might be guilty. The court had asked him:

> "But do you think that Mr. Whiteman actually did some act which proximately caused the death of Cynthia Starr?

> "Mr. Malloy: Your Honor, I don't know. So far I haven't been able to get any story that he has, except that he had rape on his mind when he met her. * * * It may be that he should be charged with an accessory after the fact. I didn't have any way of knowing definitely just—"

When this statement was made by the State's Attorney a plea of guilty had been entered by the defendant to murder in the first degree and accepted by the court. When the State's Attorney, an experienced counselor and attorney at law, expresses a doubt as to the crime committed by this defendant, can it be said that the defendant fully understood the nature of his plea?

After the completion of the examination of both Malnourie and Whiteman, the defendant Whiteman was sentenced, not under his plea of murder in the first degree, but to the crime of murder in the second degree. It is clear from this fact that the court under all the circumstances did not feel that Mr. Whiteman had made his plea with complete understanding.

Here we have a situation where the State's Attorney expresses a doubt as to the crime that should have been charged against this defendant. The court has already accepted a plea of murder in the first degree based upon an information that such crime was committed by this defendant while in the commission of a felony, to wit: rape; that after ascertaining all the facts as completely as possible, the court itself was in doubt, and to give the defendant the benefit of that doubt, sentenced him to a lesser degree of crime than that to which he has pleaded. These circumstances are conclusive of the fact that

the defendant did not freely and understandingly enter his plea, nor freely and understandingly waive counsel. This fact alone was ample reason for appointment of counsel to advise the defendant in view of the gravity of the offense.

When the entire proceedings are viewed in the light of the events that preceded the first written confession obtained from this defendant and proceedings upon the arraignment which we have set out at length in this opinion, we are satisfied that the defendant's plea of guilty to murder in the first degree was based upon a confession that was involuntarily given and that he was not afforded the right of counsel for which our constitution and statutes provide, nor did he intelligently and understandingly waive his rights. State v. Magrum, 76 N.D. 527, 38 N.W.2d 358; Williams v. Kaiser, 323 U.S. 471, 65 S.Ct. 363, 89 L.Ed. 398; Tomkins v. Missouri, 323 U.S. 485, 65 S.Ct. 370, 89 L.Ed. 407; People v. Williams, 399 Ill. 452, 78 N.E.2d 512, 3 A.L.R.2d 999. For other cases see page 1077 of note. See also Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527; Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357.

For a most enlightening and interesting discussion of the historical development of the right of counsel by an accused, see Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595. The emphasis of the law in later years has been to make the right of counsel effective and to eliminate denial thereof to any accused unless the facts and circumstances clearly disclose that counsel was competently and intelligently waived.

Since the conviction and judgment are set aside, which will of necessity involve another trial, it is unnecessary to determine what, if any, bearing the alleged newly discovered evidence may have in connection therewith.

It follows that the judgment and sentence are void. The denial of the motion is reversed. It is, therefore, ordered that the judgment and sentence against this defendant be vacated, that he be discharged from imprisonment under the judgment and sentence, and that he be returned to the custody of the sheriff of Dunn County, North Dakota, pending further proceedings in accordance with our law.

MORRIS, C. J., and GRIMSON, BURKE and SATHRE, JJ., concur.